78 F.3d 584
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Adrienne HARRIS, Plaintiff-Appellant,
v.
ELECTRONIC DATA SYSTEMS CORPORATION, Defendant-Appellee.
 No. 94-1888.
 United States Court of Appeals, Sixth Circuit.
 March 6, 1996.
 
 Before: BROWN, WELLFORD, and MILBURN, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 In this diversity action, plaintiff Adrienne Harris appeals the district court's grant of defendant Electronic Data Systems Corporation's motion for summary judgment in this action in which plaintiff alleges that defendant violated the Michigan Elliot-Larsen Civil Rights Act, Michigan Compiled Laws ("M.C.L.") § 37.2101, and the Michigan Handicappers Act, M.C.L. § 37.1101, by terminating plaintiff's employment because of her race and handicap. On appeal, the issues are (1) whether the district court erred in finding, with regard to plaintiff's race discrimination claim, that plaintiff had failed to create a genuine issue of material fact as to whether defendant's proffered reason for terminating plaintiff was pretext; and (2) whether the district court erred in finding that plaintiff had failed to establish a prima facie case of discrimination on the basis of plaintiff's handicap. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 In May 1985, plaintiff Adrienne Harris, a black female, began working for defendant Electronic Data Systems Corporation ("EDS") where she held several different positions. In the fall of 1989, plaintiff was transferred to the "PC Training Group" where she worked as a personal computer instructor. In this role, plaintiff taught classes on how to use personal computers and computer programs to General Motors and EDS employees. While plaintiff was employed by defendant, plaintiff supplemented her income by working as a real estate agent for Century 21 in Lathrup Village, Michigan.
 
 
 3
 On May 3, 1990, plaintiff was involved in an automobile accident while she was working as a real estate agent. As a result of the accident, plaintiff suffered back strain, neck strain, and a mild closed head injury. On May 7, 1990, plaintiff saw a doctor about her injuries and was referred to Dr. Carmen Ventocilla, who began treating plaintiff on June 19, 1990. Plaintiff also received treatment from a chiropractor beginning on May 15, 1990. Although plaintiff attempted to return to work at EDS soon after the accident, she was not able to do so on a consistent basis, and her treating chiropractor eventually submitted a note to EDS stating that plaintiff would be disabled from working through June 30, 1990.
 
 
 4
 EDS granted Harris short term disability leave from May through October 1990. During this time, Dr. Ventocilla periodically submitted notes to EDS stating that Harris was still disabled. While on short term disability leave, plaintiff received her full EDS salary and benefits.
 
 
 5
 In June 1990, while plaintiff was on disability leave, plaintiff's management structure changed. At that time, plaintiff's new supervisor was Kathy Saisho, team leader of the PC training group. Saisho reported to Kay Soules, the PC training manager, who reported to Margaret Lacefield, the manager of micro-computer support for EDS. Both Soules and Lacefield worked in Dallas, Texas and had never met plaintiff.
 
 
 6
 In a note dated September 26, 1990, Dr. Ventocilla stated that plaintiff could return to work on September 27, 1990. Dr. Ventocilla explained that, although plaintiff had very mild changes in concentration, memory, and spatial perception, these changes "should not preclude her return to work without restrictions in her current capacity." J.A. 103 (emphasis in original). On October 1, 1990, Harris returned to work and met with Saisho to discuss her duties and schedule. Although Dr. Ventocilla's note released Harris to return to work without restrictions, Harris claims, for the first time in her affidavit attached to her response to defendant's motion for summary judgment, that when she returned to work, "it was with the understanding that [she] would be provided with a stool to allow [her] to sit and/or stand while [she] talked ... [and] that [she] would either be provided with an overhead projector in lieu of board work or that someone else would perform [her] board work for [her] since that would cause [her] excruciating pain." J.A. 207.
 
 
 7
 Plaintiff was then scheduled to teach class on October 10, 15, and 16. On October 10, 1990, Harris taught the morning class and was assisted by another employee, Beth Massacar, who wrote on the board for plaintiff. However, in the afternoon session, Harris was not provided with an assistant and had to write on the board herself, which caused her pain in her neck and shoulder. Harris returned to work on October 11, 1990, but went home early because she was not feeling well. Dr. Ventocilla submitted another note to EDS on October 17, 1990, stating that plaintiff would be unable to return to work until November 30, 1990, due to post traumatic cervical strain and mild closed head injury.
 
 
 8
 Harris last worked at EDS on October 11, 1990. On October 18, 1990, plaintiff's short term disability pay expired, and she was placed on unpaid medical leave, during which she continued to receive all of her EDS benefits. On December 5, 1990, Dr. Ventocilla submitted another note to EDS stating that plaintiff would be disabled until sometime between February 5, 1991 and March 5, 1991. Plaintiff contends that throughout the time that she was disabled, Saisho kept business notes that show that Saisho was hostile toward plaintiff and wished to terminate plaintiff's employment. These notes include a reference to "having to take Harris back" and an instruction that, if Harris were released to work, to "throw her into it."
 
 
 9
 Saisho asserts that, while plaintiff was on medical leave, she became suspicious that Harris was working as a real estate agent while she was receiving disability benefits from EDS. She contacted her immediate manager, Soules, and Soules's manager, Lacefield, and informed them of her suspicions. On January 3, 1991, Lacefield sent a memorandum to the manager of Corporate Investigations asking for help in investigating whether Harris was working as a real estate agent while on medical leave. In the memorandum, Lacefield listed the following reasons why she suspected that plaintiff was working as a real estate agent: (1) that Harris was vague as to treatment and as to who was treating her; (2) that Harris was uncooperative in furnishing necessary physician's statements; (3) that Harris attended other EDS functions; (4) that she was difficult to reach; (5) that she called EDS before 8:30 a.m.; (6) that she was not home to receive calls during normal working hours; (7) that she returned EDS's phone messages after 4:00-5:00 p.m.; (8) that sometimes when Harris called, other phones could be heard ringing in the background; and (9) that because she worked part-time as a real estate agent, it was suspected that she was working at Century 21.
 
 
 10
 In response to Lacefield's request, William O'Keefe, a corporate investigator manager, and Valerie McGlothin, a senior investigator, were assigned to determine the extent of Harris's real estate activities. In this connection, O'Keefe contacted the Century 21 office where plaintiff had worked and posed as a prospective home buyer. O'Keefe claimed that he was told that Harris was not there but that he could leave a message because Harris was in periodically. In contrast, Harris asserts that the Century 21 office told O'Keefe that Harris did not work there but that they would attempt to contact her. Harris claims that someone in the Century 21 office agreed to give her materials in an attempt to get the prospective customer to call the Century 21 office again so that a different agent could help him.
 
 
 11
 On January 29, 1991, O'Keefe and McGlothin met Harris at a restaurant. O'Keefe and McGlothin swore in their affidavits that Harris informed them that she had homes in the area that she would like to show them; that she had been in the real estate business for four years; that she had worked for EDS until she had been in an automobile accident in May 1990; and that she was fully recuperated from her auto accident and was working full-time as a real estate agent. However, Harris denied in her affidavit that she told O'Keefe and McGlothin that she was working full-time, that she had been in auto accident, or that she had fully recuperated.
 
 
 12
 O'Keefe and McGlothin relayed the results of their investigation directly to Lacefield. Lacefield contends that, as a result of the investigation, she decided to terminate Harris's employment. Lacefield asserts that she made this decision because she concluded that Harris's conduct of receiving disability benefits based upon her doctor's representation that she was completely disabled from working when she was in fact working full-time as a real estate agent violated the EDS Code of Conduct which prohibits dishonesty. On February 4, 1991, Saisho informed Harris, in accordance with Lacefield's instructions, that she was being discharged.
 
 B.
 
 13
 On October 9, 1992, plaintiff Adrienne Harris filed a complaint in the Wayne County (Michigan) Circuit Court alleging that defendant EDS fired her in violation of her just cause employment contract, in violation of the Michigan Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101, and in violation of the Michigan Handicappers Act, M.C.L. § 37.1101, by terminating her employment because of her race and handicap. On November 20, 1992, defendant EDS removed the case to federal court on the basis of the diversity of citizenship of the parties.
 
 
 14
 Defendant filed a motion for summary judgment on January 18, 1994. Plaintiff responded to defendant's motion on March 18, 1994.[1] On July 22, 1994, the district court granted defendant's motion for summary judgment. In granting defendant's motion as to plaintiff's race discrimination claim, the district court found that plaintiff had failed to rebut defendant's proffered explanation as to why it discharged plaintiff. The district court also found that, as to plaintiff's handicap discrimination claim, plaintiff had failed to establish a prima facie case of discrimination. The district court entered summary judgment for defendant on July 22, 1994, and this timely appeal followed.
 
 II.
 A.
 
 15
 Plaintiff argues that the district court erred in granting defendant's motion for summary judgment as to her claim of discrimination on the basis of race. This court reviews a district court's grant of summary judgment de novo and applies the same test as that used by the district court in reviewing a motion for summary judgment. Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388 (6th Cir.1993) (per curiam). Pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir.1995). On appeal, we must consider all facts and inferences drawn therefrom in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).
 
 
 16
 The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact, making it necessary to resolve the difference at trial. Id. at 324. Not all factual disputes between the parties, however, will defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In order for a factual dispute to defeat a motion for summary judgment, the dispute must be in regard to a material fact that might affect the outcome of the action under governing law. Id. at 248. Moreover, this court has held that the nonmoving party "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' " Barnhart, 12 F.3d at 1389 (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir.1989)). Thus, " '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the [nonmoving party], the motion should be granted. The trial court has at least some discretion to determine whether the [nonmoving party's] claim is plausible." Id.
 
 
 17
 Under the Michigan Elliot-Larsen Civil Rights Act, a plaintiff may establish a claim of disparate treatment, which requires a showing of either a pattern of intentional discrimination against protected employees or against an individual, with sufficient direct or indirect evidence of intentional discrimination. See Lytle v. Malady, 530 N.W.2d 135, 140 (Mich.Ct.App.1995). Plaintiff argues that she presented direct evidence of race discrimination. In this regard, plaintiff states in her affidavit attached to her response to defendant's motion for summary judgment that she overheard Soules tell Saisho after she was discharged that "those people are lucky to even have a job for this long and we are not a welfare system." J.A. 210.
 
 
 18
 Michigan courts have explained that direct evidence of disparate treatment is evidence that, if believed, would prove the existence of the employer's illegal motive without any benefit of presumption or inference. Lytle, 530 N.W.2d at 140. Moreover, this court has held that isolated and ambiguous remarks are not sufficient to support a finding of discrimination. Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 314 (6th Cir.1989). We conclude that Soules's alleged comment is not clear proof of racial animus and does not constitute direct evidence of discrimination. Accordingly, we hold that the district court did not err in concluding that plaintiff failed to present any direct evidence of race discrimination.
 
 
 19
 Plaintiff also argues that she presented sufficient circumstantial and statistical evidence to establish a claim of race discrimination. Michigan courts have analyzed disparate treatment claims supported by circumstantial or statistical evidence in the same manner as federal civil rights claims. See Jenkins v. Southeastern Mich. Chapter, Am. Red Cross, 369 N.W.2d 223, 227 n. 2 (Mich.Ct.App.1985). Under the framework for analyzing cases supported by circumstantial evidence established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and adopted by Michigan courts, see Dubey v. Stroh Brewery Co., 462 N.W.2d 758, 759 (Mich.Ct.App.1990) (per curiam), a plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas, 411 U.S. at 802. A plaintiff may establish an initial prima facie case of discrimination by proving that (1) the plaintiff is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class. Id.[2] If the plaintiff succeeds in establishing a prima facie case, which creates a presumption that the defendant unlawfully discriminated against the plaintiff, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981). However, the ultimate burden of persuasion always remains with the plaintiff. St. Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742, 2747-48 (1993). If the defendant is able to articulate a legitimate, nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination. McDonnell Douglas, 411 U.S. at 802.
 
 
 20
 A plaintiff may show that the defendant's proffered reasons for its actions were a mere pretext either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or, indirectly, by showing that the proffered reason is not worthy of credence. Clark v. Uniroyal Corp., 327 N.W.2d 372, 374 (Mich.Ct.App.1982) (per curiam) (citing Burdine, 450 U.S. at 255). Generally, there are three ways in which an employment discrimination plaintiff may show that his employer's proffered reasons for dismissing him are pretext. The plaintiff may demonstrate pretext by showing: (1) that the stated reasons for his firing had no basis in fact, (2) that the stated reasons for his firing were not the actual reasons, and (3) that the stated reasons for his firing were insufficient to explain the discharge. Dubey, 462 N.W.2d at 760; Barnhart, 12 F.3d at 1390. The first type of showing consists of evidence that the proffered bases for the plaintiff's discharge never happened and are thus "factually false." Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir.1994). The third showing ordinarily consists of evidence that other employees not in the protected class were not fired although they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. Id. "These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing [the] plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.' " Id. (quoting St. Mary's Honor Ctr, 113 S.Ct. at 2749). In the second type of rebuttal, the plaintiff admits that such conduct could motivate dismissal. Thus, the plaintiff indirectly attacks the credibility of the proffered explanation by showing, through the sheer weight of circumstantial evidence, that an illegal motivation was more likely than the explanation offered by the defendant. Id.
 
 
 21
 In this case, defendant asserts that it terminated plaintiff because of its belief that she violated the company policy against dishonesty by claiming that she was disabled and by accepting disability benefits from defendant while she worked full-time as a real estate agent. The district court granted defendant's motion for summary judgment as to plaintiff's race discrimination claim upon finding that, assuming that plaintiff had established a prima facie case of race discrimination, plaintiff had failed to rebut defendant's proffered legitimate nondiscriminatory reason for terminating plaintiff's employment. Specifically, the district court found that plaintiff had failed to rebut defendant's proffered explanation of its conduct because she did "not conclusively prove[ ] that she did not defraud EDS; she ... failed to show that she did not engage in any real estate sales while on disability status with EDS;" and she did not show "that other employees accused of defrauding EDS have not been similarly terminated." J.A. 1290.
 
 
 22
 Plaintiff argues that the district court resolved material questions of fact in defendant's favor in finding that plaintiff failed to rebut defendant's proffered reason for terminating plaintiff's employment. First, plaintiff asserts that she presented evidence that created a question of fact as to whether defendant's explanation for her termination, i.e., that she violated EDS's work rule prohibiting dishonesty, had a basis in fact. In this regard, plaintiff denies having told EDS's corporate investigators that she was working full-time or that she had fully recuperated from her automobile accident. In addition, plaintiff presented the deposition testimony of Ronald Simpson, the office manager of Century 21, who stated that plaintiff did not work for Century 21 while she received disability benefits from defendant. Plaintiff further asserts that only an independent medical examination could prove that plaintiff was fully recuperated from her injuries.
 
 
 23
 This evidence, however, fails to rebut defendant's reason for terminating plaintiff's employment. Lacefield testified that, based on the results of the corporate investigation as reported by O'Keefe and McGlothin, she determined that plaintiff had violated the corporation's policy against dishonesty by receiving disability benefits from EDS while she was working as a real estate agent. Several courts have held that, even if a plaintiff did not in fact commit the violation with which he or she was charged, an employer may successfully rebut any prima facie case of disparate treatment by showing that it honestly believed that the employee committed the violation. Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir.1995); Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989); Bechold v. IGW Sys., Inc., 817 F.2d 1282, 1285 (7th Cir.1987). These courts have made clear that the focus of plaintiff's rebuttal should not be whether an employer made an erroneous decision, but whether the decision was made with a discriminatory motive. Mayberry, 55 F.3d at 1091. In this case, plaintiff has presented no evidence why it would be unreasonable for Lacefield to have believed O'Keefe and McGlothin's report that indicated that plaintiff was working as a real estate agent. Therefore, plaintiff failed to rebut defendant's legitimate non-discriminatory reason for firing plaintiff.
 
 
 24
 Second, plaintiff asserts that even if defendant's proffered reason for her termination had a basis in fact, it was not the motivating reason for defendant's decision to terminate her. Instead, plaintiff argues that she presented evidence that showed that Saisho was hostile towards plaintiff and had decided to terminate plaintiff's employment before the corporate investigation took place. In addition, plaintiff claims that the corporate investigation of plaintiff was merely a means to uncover a reason to fire plaintiff. In support of this contention, plaintiff presented evidence that, before the corporate investigation took place, Saisho wrote a note stating: "LTD [long term disability] no longer an option = separate her from company. K[ay] will call legal affairs to run by them. I'll call Bill." J.A. 312. Plaintiff also presented evidence through the deposition of Kathie O'Grady, employee relations specialist at EDS, that when an employee was suspected of defrauding the company, the usual company procedure was not to first conduct a corporate investigation but to ask the employee if he or she was working while receiving disability benefits. Furthermore, plaintiff notes that Saisho and O'Grady disagree as to who suggested that the company investigate plaintiff's real estate activities. Finally, plaintiff presented evidence that Saisho actually wrote the memo requesting a corporate investigation of plaintiff and that Lacefield merely signed this memo. Thus, plaintiff asserts that Saisho instigated the corporate investigation, in which the investigators had predetermined what statements would be attributed to plaintiff, in order to provide a reason for terminating plaintiff.
 
 
 25
 We conclude that this evidence also fails to rebut defendant's proffered non-discriminatory reason for discharging plaintiff. The record shows that Saisho's notes discussing the possibility of terminating plaintiff's employment before the corporate investigation took place were made after Saisho referred to "the latest evidence that [plaintiff] is working out of a real estate office." J.A. 312. Thus, this reference in Saisho's business notes does not show that Saisho wished to terminate plaintiff's employment for reasons other than her belief that plaintiff was defrauding the company by receiving disability benefits while working as a real estate agent. Furthermore, even if Saisho's notes, when viewed in the light most favorable to plaintiff, indicate some hostility toward plaintiff, this hostility does not show that Saisho influenced Lacefield's decision to terminate plaintiff. The rule in this court is "that a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official." McDonald v. Union Camp Corp., 898 F.2d 1155, 1161 (6th Cir.1990). In this case, there is no evidence that Lacefield's decision to discharge plaintiff was influenced by Saisho's alleged hostility towards plaintiff rather than the results of the corporate investigation that showed that plaintiff was working as a real estate agent while receiving disability benefits from EDS. Therefore, we hold that plaintiff failed to rebut the defendant's proffered non-discriminatory reason for firing plaintiff and that the district court did not err in granting defendant's motion for summary judgment on this basis.
 
 B.
 
 26
 Next, plaintiff argues that the district court erred in granting defendant's motion for summary judgment as to her claim that she was terminated because of her handicap. Plaintiff asserts that defendant violated the Michigan Handicappers' Civil Rights Act, M.C.L. § 37.1101 ("HCRA" or "the Act"), by failing to accommodate her handicap and by terminating her employment because she was handicapped.
 
 
 27
 In order to establish a prima facie case of handicap discrimination under the HCRA, a plaintiff must establish: "(1) the plaintiff is "handicapped" as defined by the HCRA, (2) the handicap is unrelated to the plaintiff's ability to perform the duties of a particular job; and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute." Hall v. Hackley Hosp., 532 N.W.2d 893, 896 (Mich.Ct.App.1995) (per curiam); see also Dzierbowicz v. American Seating Co., 530 N.W.2d 158, 159 (Mich.Ct.App.1995). Here, plaintiff argues that defendant violated M.C.L. § 37.1202(1)(b) by discharging plaintiff because of a handicap that is unrelated to her abilities to perform her duties, and M.C.L. § 37.1102(2) by failing to accommodate plaintiff's handicap.
 
 
 28
 In granting defendant's motion for summary judgment, the district court found that plaintiff had failed to make a prima facie case of discrimination under the Act because she was not "handicapped" within the meaning of the HCRA. Under the HCRA, a handicap is defined to include a determinable physical characteristic that "substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion." M.C.L. § 37.1103(e)(i)(A). Thus, a disability that is related to one's ability to perform the duties of a particular position is not a "handicap" within the meaning of the HCRA. Ashworth v. Jefferson Screw Prods., Inc., 440 N.W.2d 101, 104 (Mich.Ct.App.), appeal denied, 447 N.W.2d 690 (Mich.1989). The general rule in Michigan is that if a plaintiff is unable to perform his or her duties at the date of discharge, then he or she is not handicapped under the meaning of the HCRA and summary disposition of his or her claim is proper. Rymar v. Michigan Bell Telephone Co., 476 N.W.2d 451, 452 (Mich.Ct.App.1991), appeal denied, 479 N.W.2d 636 (Mich.1992); Ashworth, 440 N.W.2d at 104; Bowerman v. Malloy Lithographing, Inc., 430 N.W.2d 742, 745 (Mich.Ct.App.1988) (per curiam); Wilson v. Acacia Park Cemetery Ass'n, 413 N.W.2d 79, 82 (Mich.Ct.App.1987).
 
 
 29
 Plaintiff makes two arguments that, although she was unable to perform her job duties at the date of her discharge, she was "handicapped" as defined by the HCRA. First, she argues that her disability was not related to her ability to perform her duties because she could have continued to work if the accommodations that were provided to her on the morning of October 10, 1990, i.e., a stool and an assistant to do her board work, had continued instead of being taken away.[3] Plaintiff's argument, however, must fail. The fact that plaintiff might not have aggravated her injuries if defendant had continued to provide plaintiff with an assistant to do her board work does not alter the fact that, according to the doctors' notes submitted to EDS, plaintiff was unable, with or without accommodation, to perform her duties on the date of her discharge. Thus, at the time that plaintiff was discharged, February 4, 1991, plaintiff was completely disabled according to her doctors.
 
 
 30
 Plaintiff also argues, relying on the Michigan Court of Appeals's decision in Rymar, that we should look beyond the date of plaintiff's discharge to determine whether plaintiff's disability was related to her ability to perform her job duties. In Rymar, the plaintiff alleged that she was not given the same leave time as other employees. Rymar, 476 N.W.2d at 452. The court held that in such a case, it could look at the plaintiff's disability status after the date that she was discharged. Id.
 
 
 31
 However, Rymar is distinguishable from the present case. In the present case, plaintiff was given nine months leave before her discharge and the only employees that she can identify as having more leave time are female employees who were given maternity leave. We conclude that plaintiff has not shown that she was not given a reasonable time to heal or that other employees in like situations were given more leave time. Thus, Rymar is inapplicable to this case, and we shall look to plaintiff's date of discharge in determining whether plaintiff was handicapped as defined by the HCRA. Because plaintiff was unable to perform her job duties on the date of her discharge according to her doctors, we conclude that she failed to show that she was "handicapped" under the HCRA and thus did not establish a prima facie case of discrimination under the HCRA. Therefore, we hold that the district court did not err in granting defendant's motion for summary judgment on this ground.
 
 III.
 
 32
 For the reasons stated, the summary judgment of the district court is AFFIRMED.
 
 
 33
 WELLFORD, Circuit Judge, concurring in part and dissenting in part:
 
 
 34
 I concur fully with my colleagues' decision to affirm the district court with respect to plaitniff's race discrimination claim. Plaintiff simply failed to show that race was a determinative factor in EDS's decision to terminate her employment. I dissent, however, from the portion of the majority's opinion dealing with Harris' claim of handicap discrimination. Upon giving plaintiff the benefit of all favorable inferences, I find that a number of genuine factual issues exist with respect to that claim.
 
 
 35
 The evidence shows that plaintiff was able to return to work in October 1990 and that she performed her old job satisfactorily for a short time with certain accommodations provided by EDS. The evidence also seems to support plaintiff's claim that the removal of these accommodations lead to a reoccurrence or aggravation of her previous injuries. However, questions exist as to whether, when, and if Harris requested or gave notice of her need for specific accommodation. Additionally, there is a question as to whether plaintiff was really disabled.[1] Furthermore, there are questions as to whether Harris was willing and almost ready to return to work--again, with some reasonable accommodation--at or about the time of her termination, and whether Harris was offered another position with EDS. Finally, there are factual issues with respect to plaintiff's assertion of pretext, such as whether Harris was actually doing real estate work during the period of time that she claimed to be disabled, and whether Saisho, or other supervisory personnel, wanted to terminate Harris because they were suspicious of her claimed disability and tired of having to provide replacements for her.
 
 
 36
 Although Harris may have a difficult time going forward with her handicap discrimination claim, I am persuaded that it is sufficiently grounded in fact to withstand summary judgment at this juncture. As a result, I would REVERSE and REMAND for further proceedings on this issue.
 
 
 
 [1]
 In plaintiff's response to defendant's motion for summary judgment, plaintiff conceded that she had signed an at-will employment contract and thus did not oppose defendant's motion for summary judgment as to her wrongful discharge claim
 
 
 [2]
 A plaintiff may also establish a prima facie case of disparate treatment under Michigan law by showing that he is a member of the class entitled to protection under the Elliot-Larsen Civil Rights Act, that he was discharged, and that the person discharging him was predisposed to discriminate against persons in the affected class and had actually acted on that disposition in discharging him. Marsh v. Department of Civil Serv., 433 N.W.2d 820, 823 (Mich.Ct.App.1988) (per curiam) (citing Michigan Civil Rights Comm. v. Chrysler Corp., 263 N.W.2d 376, 379 n. 3 (Mich.Ct.App.1977)), appeal denied, 432 Mich. 874 (1989); see Pitts v. Michael Miller Car Rental, 942 F.2d 1067, 1070 n. 1 (6th Cir.1991)
 
 
 [3]
 Plaintiff argues that a question of fact exists whether she requested that she be provided accomodations when she returned to work on October 10, 1990. The record reflects that, although plaintiff submitted a functional capacity test to EDS on September 4, 1990, that listed, as an "option," that plaintiff use an overhead projector or visual aids instead of writing in large quantities on the chalkboard and that plaintiff stand on a stool when she does write on the chalkboard, her doctor submitted a note on September 26, 1990, stating that she could return to work the next day "without restrictions." J.A. 103. Therefore, in light of the fact that plaintiff submitted a subsequent note from her doctor stating that plaintiff needed no accomodations, we hold that plaintiff has not created a question of fact whether she requested accomodations before she returned to work on October 10, 1990
 
 
 [1]
 In my view, whether plaintiff suffered from a mild closed head injury and whether such injury was consequential are themselves fact questions