Debra A. BEENE, Plaintiff,

v.

ST. VINCENT MERCY MEDICAL CENTER, et al., Defendants.

No. 3:99CV7114.

United States District Court, N.D. Ohio, Western Division.

June 20, 2000.

Rolf H. Scheidel, Shumaker, Loop & Kendrick, Toledo, OH, for Defendants.

Thomas A. Sobecki, Toledo, OH, for Plaintiff.

## ORDER

CARR, District Judge.

This is an employment discrimination case in which plaintiff Debra Beene alleges she was discriminated against at her job with St. Vincent Mercy Medical Center (St. Vincent). This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. Pending is defendants' motion for summary judgment. (Doc. 19). For the following reasons, defendants' motion shall be granted.

## BACKGROUND

St. Vincent hired Ms. Beene in November 1985 to work as a registered nurse. Ms. Beene is African American. On May 22, 1998, St. Vincent discharged Ms. Beene after 13 years of service.

Prior to her discharge, Ms. Beene was assigned to the Cardiac ICU, known as Unit 1B, where she provided nursing care to seriously ill cardiac patients. Linda Baumgartner, the nurse manager of Unit 1B, was responsible for supervising Ms. Beene and other registered nurses in the ICU. As part of her supervisory duties, Ms. Baumgartner, who is white, ensured that all nurses in her charge treated patients with the requisite degree of care. If they did not, Ms. Baumgartner was responsible for disciplining them in accordance with St. Vincent's policy on poor work performance.

St. Vincent's work performance policy sets forth five categories of disciplinary infractions. With each increase in level, the infraction at issue becomes more serious and the discipline more severe. At Level I, the employee receives coaching so that she learns not to repeat her mistake in the future. At Level II, the employee is issued a written warning. At Level III, the employee is suspended for the first time. At Level IV, the employee receives a second, longer suspension. Finally, at Level V, the employee is discharged.

The seriousness of an infraction is determined by a point system. In cases where the infraction involves the incorrect administration of medication, St. Vincent has created a Medication Error Analysis Tool that values such errors numerically. Factors such as the type of drug, drug dosage, reporting and discovery time, and the intervention required to fix an error all contribute to the number of points counted. If multiple errors are made, the points are added up, and the employee's supervisor metes out punishment in accordance with a grid that demarcates the five levels:

| Points | Seriousness | Discipline |
|--------|-------------|------------|
| 1–15 | Level I Error | Coaching |
| 16–28 | Level II Error | Written Warning |
| 29–40 | Level III Error | First Suspension |
| 41–50 | Level IV Error | Second Suspension |
| 50+ | Level V Error | Discharge |

### A. First Suspension

On January 17, 1996, Ms. Baumgartner suspended Ms. Beene. The circumstances surrounding this suspension began when Ms. Baumgartner received a complaint from Debra Longstreet, the nurse-manager of the Department of Oncology at St. Vincent. According to Ms. Longstreet, a patient transferred into her department from Unit IB had very high potassium levels in his blood. After reviewing the patient's medical chart, Ms. Longstreet discovered that 1) the patient had a high potassium reading of 5.5 while on Unit IB before being transferred, 2) the patient's Unit 1B nurse had taken no action (such as informing the patient's doctor), resulting in a dangerously high potassium count of 6.2, and 3) the patient's medical chart had not been completed by the Unit 1B nurse.

Ms. Longstreet deemed the potassium error so serious that she filled out an incident report. In her report, Ms. Longstreet observed that the patient in question was suffering from kidney dysfunction, and that elevated potassium levels in kidney patients is particularly dangerous.

Ms. Baumgartner later identified Ms. Beene as the nurse who had cared for the patient before he was transferred to the Department of Oncology. Because Ms. Beene was under Ms. Baumgartner's su-

pervision, Ms. Baumgartner conducted a full investigation. During this investigation, additional medication errors involving three other patients in Ms. Beene's care were uncovered.

In a meeting with Ms. Baumgartner, Ms. Beene denied that the Oncology patient's potassium levels reached 5.5. She acknowledged, however, that she had observed a reading of at least 5.0. Ms. Beene further claimed that she did, in fact, notify the patient's doctor of the high potassium levels, contrary to Ms. Longstreet's conclusion that no action had been taken. Ms. Baumgartner responded that there was no documentation to support Ms. Beene's alleged call to the doctor, and that the 5.5 reading clearly was noted in the laboratory section of the medical chart.

In another case involving another patient, Ms. Baumgartner learned that Ms. Beene failed to document that she had administered Lasix, a diuretic drug. Ms. Beene did not dispute this error.

A medication error involving yet another patient related to Ms. Beene's failure to verify that a PTT lab test had been ordered from the laboratory. Ms. Beene did not dispute that the doctor's PTT order had not been implemented, but claimed that she had instructed a clerk to follow through on the test, and the clerk was at fault for not doing so. Ms. Baumgartner responded that it was Ms. Beene's responsibility to confirm that the test was, in fact, ordered by the clerk.

In accordance with the Medication Error Analysis Tool, Ms. Baumgartner assigned 18 points to Ms. Beene's failure to take action on the high potassium reading, 17 points to the Lasix error, and 17 points to the PTT error. Two other medication errors resulted in an additional 18 points.

After completing her investigation, Ms. Baumgartner consulted Kimberly Edwards, a human resources representative at St. Vincent, to determine the level of discipline to impose on Ms. Beene. Although the point total (80) exceeded the highest level of seriousness, and could have resulted in Ms. Beene's discharge, Ms. Edwards recommended a lesser punishment: "first suspension." Ms. Beene was given a first suspension in view of her many years of employment.

Ms. Beene appealed her suspension in accordance with St. Vincent's grievance procedure. A hearing was held. After the hearing, points for two of the medication errors were dropped and the points for the Lasix error were reduced. But Ms. Baumgartner's findings with regard to the PTT and potassium errors were upheld. The new number of points totaled 43, enough to warrant a Level III "second suspension," and thus the first suspension was allowed to stand.

Ms. Beene did not file a complaint with the Equal Employment Opportunity Commission (EEOC) regarding her first suspension.

## B. Second Suspension

On October 1, 1997, Ms. Beene received a second suspension. This suspension arose out of the death of a patient under Ms. Beene's care. The patient had a heart attack, but the alarms on his cardiac monitor, intended to alert the hospital staff in the event of an attack, were disengaged. Thus, no audible alarm was sounded when the patient went into arrest. The patient later died.

Ms. Baumgartner investigated the patient's death, focusing on why the alarms had been disengaged. During her investigation, Ms. Baumgartner discovered that Ms. Beene noted on the patient's medical chart that the alarms were active at 4:00 p.m., 5:00 p.m., and 6:00 p.m., long after the patient was dead and taken to the morgue.

Ms. Baumgartner confronted Ms. Beene with her findings. Ms. Beene admitted that she had made all entries regarding the alarms at the beginning of her shift rather than at hourly intervals as suggested on the medical chart.

In her deposition, Ms. Beene testified that it was her responsibility to see that the patient's monitor was activated and that it was possible that she had inadvertently disengaged it. She also testified that it was hospital policy that she check the monitor at hourly intervals and document her observations contemporaneously. Ms. Beene admitted that she was prohibited from filling out a medical chart at the beginning of a shift, but that she did it anyway to save herself time. Finally, she testified that she took off work the day after the incident because she knew "there would be repercussions" as a result of her conduct.

Because she violated hospital policy, Ms. Beene received a second suspension, which she challenged through St. Vincent's grievance procedure. After the suspension was upheld, Ms. Beene exercised her right to appeal to a Grievance Review Panel, composed of three hourly employees and two managers selected randomly from St. Vincent's employee population. At a hearing before the Grievance Review Panel, Ms. Beene presented evidence with the assistance of a union representative.

The Grievance Review Panel, however, upheld the second suspension, finding "false documentation, poor practice of a nurse with 10 years experience, failure to complete incident report and call management, and poor documentation of patient care and code events."

After her grievance was denied, Ms. Beene filed a claim with the EEOC, alleging that St. Vincent and Ms. Baumgartner were guilty of racial discrimination in issuing the second suspension.

## C. Discharge

On May 20, 1998, Ms. Baumgartner received a note from a doctor complaining that he had discovered a telemetry recording on his patient's medical chart that displayed a run of ventricular tachycardia (VT). VT is a fast and potentially dangerous beating of the heart. The doctor expressed concern because he had not been informed of the change in his patient's condition.

Ms. Baumgartner examined the patient's medical chart and determined that someone had mistakenly placed another patient's telemetry strip on the chart of the complaining doctor's patient. Both patients had been cared for by Ms. Beene while they were admitted to the hospital. When confronted, Ms. Beene acknowledged her error and her failure to call the doctor, as she should have, to report the abnormal VT. Her excuse was that she was extremely busy.

After consulting with St. Vincent's human resources department, Ms. Baumgartner decided that, given Ms. Beene's history of disciplinary problems, she should be discharged. Accordingly, on May 22, 1998, Ms. Baumgartner terminated Ms. Beene.

Ms. Beene filed a grievance over her discharge, resulting in a hearing before the Grievance Review Panel. The Grievance Review Panel unanimously upheld the discharge. Thereafter, St. Vincent's top human resources officer, who is African American, agreed with the conclusions of the Grievance Review Panel.

Ms. Beene next pursued arbitration of her claim with the American Arbitration Association as permitted by St. Vincent's grievance process. A hearing was held. The arbitrator denied Ms. Beene's grievance, concluding that Ms. Beene was guilty of serious disciplinary infractions justifying discharge:

It has been concluded that the events of May 18, 1998 [the VT strip error] warranted discipline and, in fact, constituted a very serious matter. In light of the prior disciplines in Grievant's record, it is concluded that discharge was appropriate and the grievance will be denied.

After Ms. Beene's grievance was dismissed, she filed a claim for unemployment insurance benefits. Her claim was denied. Ms. Beene retained a lawyer. The lawyer represented Ms. Beene on appeal. After a

hearing on her appeal, the denial of benefits was upheld because Ms. Beene had been "discharged for just cause in connection with work."

Subsequent to her discharge, Ms. Beene filed yet another complaint with the EEOC, alleging that she was discharged because of her race. The EEOC then issued a right to sue letter, granting Ms. Beene the right to file a claim in this Court. Ms. Beene later filed a second complaint with the EEOC. In her second complaint, Ms. Beene again alleged that she was fired for racially discriminatory reasons. But she further alleged that St. Vincent and Ms. Baumgartner terminated her in retaliation for her previous complaint to the EEOC regarding her second suspension.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather,

Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## DISCUSSION

Ms. Beene alleges that defendants violated Title VII and Ohio's anti-discrimination laws in three respects: 1) by suspending her; 2) by terminating her; and 3) by retaliating against her for filing complaints with the EEOC. None of these contentions has merit.

### I. Second Suspension And Discharge

Analysis for claims of race discrimination is the same whether claimed under Title VII or Ohio law. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Commission*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981). Title VII prohibits discrimination "against any individual with respect to compensation, terms, conditions, or privileges of employment because of an individual's race, color, religions, sex, or national origin." 42 U.S.C. § 2000e–2(c)(1). The Supreme Court has recognized two distinct types of Title VII employment discrimination: disparate treatment and disparate impact.

■ Ms. Beene claims that she was disparately treated, which occurs when an employer treats some employees unfavorably because of race, religion or sex. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). To base a claim on disparate treatment, a plaintiff must show discriminatory intent. *Id.* Such proof can be established by direct evidence or may be inferred by a prima facie showing of

discrimination. *Id.; see also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

If Ms. Beene can meet her prima facie burden, the burden shifts to defendants to articulate a non-discriminatory reason for Ms. Beene's disparate treatment. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. If defendants carry this burden, then Ms. Beene must show that the proffered reason is a pretext for discrimination. *Id.*

To demonstrate pretext, Ms. Beene must show both that the proffered "reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Ms. Beene cannot overcome summary judgment merely by contesting the factual basis for defendants' adverse employment action. *Harris v. Electronic Data Systems Corp.*, 78 F.3d 584, 1996 WL 99311, *6 (6th Cir.1996) (mere denial of allegations against plaintiff were insufficient to raise a genuine issue of fact as to pretext) (unpublished decision).

"[E]ven if plaintiff did not in fact commit the violation with which he or she was charged, an employer may successfully rebut any prima facie case of disparate treatment by showing that it honestly believed that the employee committed the infraction." *Id.* (citing *Mayberry v. Vought Aircraft Company*, 55 F.3d 1086, 1091 (5th Cir.1995); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989); *Bechold v. IGW Systems, Inc.*, 817 F.2d 1282, 1285 (7th Cir.1987)). This is because "the focus of plaintiff's rebuttal should not be whether an employer made an erroneous decision, but whether the decision was made with a discriminatory motive." *Id.* (citing *Mayberry*, 55 F.3d at 1091).

Here, Ms. Beene alleges that she was suspended and discharged from her job because she is African American. Defendants dispute that Ms. Beene can prove the prima facie elements of her claim, and, further, offer a legitimate non-discriminatory reason for their actions against her:

multiple, serious violations of the standards of nursing care. Moreover, defendants argue that even if Ms. Beene could make a prima facie case, she cannot show that defendants' proffered reasons for her second suspension and discharge are a pretext for discrimination. I agree.

### A. Prima Facie Case

Ms. Beene cannot prevail on her second suspension and termination claims because she is unable to prove the prima facie elements of discriminatory treatment. A prima facie case of discriminatory treatment requires plaintiff to show that: 1) she is a member of a protected class; 2) she is qualified for the position in question; 3) in spite of her qualifications, plaintiff was suspended and/or fired; and 4) the position was filled by a non-minority after plaintiff's firing *or* plaintiff was suspended and/or fired when similarly situated non-minority employees were not for comparable violations. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir.1995). Ms. Beene has failed to satisfy the fourth prima facie requirement.

Ms. Beene has not alleged that she was replaced by a non-minority employee and she cannot show that similarly situated non-minority employees were treated more favorably than she when they committed comparable disciplinary infractions.

■ Under Title VII, when a plaintiff compares herself to the treatment received by co-employees, the comparison group must be similarly situated "in all respects." *Kirkland v. Runyon*, 887 F.Supp. 1001, 1004 (S.D.Ohio 1995) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "In other words, they must have dealt with the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [hospital's] treatment of them for it." *Id.* It is the plaintiff's burden to establish that

another employee's acts were of comparable seriousness to his or her own. *Warfield v. Lebanon Correctional Institution*, 181 F.3d 723, 730 (6th Cir.1999).

Here, Ms. Beene has not proffered any evidence of comparable employees who are similar to her in all pertinent respects. For example, Ms. Beene argues that Amy Cline, a registered nurse who administered potassium to a patient although the patient already had high potassium levels, received no discipline after the patient went into cardiac arrest. Ms. Beene, meanwhile, received a first suspension for her error involving potassium. According to Ms. Beene, this suggests discriminatory animus sufficient to satisfy her prima facie burden.

Even taking this allegation as true, the comparison is irrelevant because Ms. Beene's first suspension is not at issue here. Ms. Beene never filed an EEOC complaint regarding her first suspension. Rather, the first time she had any contact with the EEOC was following her second suspension, which 1) had nothing to do with potassium and 2) occurred more that thirteen months after the first suspension. Because Ms. Beene failed to exhaust her administrative remedies with regard to the first suspension, the first suspension is immaterial. *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir.1991) ("[F]or federal courts to have subject matter jurisdiction of Title VII claims, the claimant must first unsuccessfully pursue administrative relief.").

■ With regard to the second suspension, Ms. Beene has not identified a single nurse under Ms. Baumgartner's supervision who falsified a medical chart to suggest that a patient's cardiac alarms had been checked at hourly intervals when, in fact, they had not. Though Ms. Beene has presented the affidavit of Judith Liebnau, who attested to one instance where she heard from a co-worker, B.J. Snyder, that Ms. Cline falsified the medical chart of a patient whose leg was amputated, her affidavit is rife with hearsay. Ms. Liebnau

has no personal knowledge that Ms. Cline falsified anything—her entire opinion rests on what she was told by B.J. Snyder. Yet there is no affidavit or deposition testimony from B.J. Snyder to substantiate Ms. Liebnau's allegations.

Beyond the hearsay evidence in Ms. Liebnau's affidavit, there is no proof that other nurses lied about the engagement of cardiac alarms (or falsified medical charts in any respect) yet were given lax treatment by Ms. Baumgartner.

Ms. Beene spends considerable time in her opposition citing other missteps by nurses. For example, Ms. Liebnau and another registered nurse, Cynthia Wagner, attested that, in addition to the amputation incident, Ms. Cline made several mistakes that went unpunished. Ms. Liebnau described a time when Ms. Cline improperly inserted an IV line into a patient and the patient developed a blood clot, leading to his death. In another case, Ms. Cline allegedly failed to contact a patient's doctor though the patient kept vomiting; the patient's heart later stopped, and he had to be revived by CPR.

These errors all are distinguishable from Ms. Beene's conduct. In no case did the offending nurse falsify medical records. Even assuming that Ms. Cline, for example, is utterly incompetent, there is no proof that she tried to hide her mistakes from her supervisors, or that she filled out medical charts at the start of her shift when she was supposed to gather data on patients at hourly intervals.

The remaining anecdotal evidence contained in the affidavits relied on by Ms. Beene is likewise flawed. Ms. Wagner confessed that she often made mistakes and escaped discipline. In her affidavit, she attested that she accidently suspended cardiac alarms on several occasions, yet never was punished. But Ms. Wagner did not falsify medical charts, much less do so in a case involving a patient's death.

Ms. Wagner further attested that it was common practice for nurses to "chart

ahead," in other words, mark hourly intervals three or four hours before treatment actually was administered. But she can not attest that such violations of hospital policy were known to Ms. Baumgartner, and, if they had been, that Ms. Baumgartner would not have disciplined the violator.

Several affiants attested that no nurse ever had been disciplined for charting ahead. But the requisite foundation for this allegation is entirely lacking. There are over eighty nurses on staff at Unit IB. To suggest credibly that no nurse ever has been disciplined for charting ahead, one would need access not only to the disciplinary records and personnel files of the eighty nurses currently on staff, but also every nurse previously on staff who has since left St. Vincent. No such foundation has been laid. Therefore, this testimony must be disregarded.

In sum, Ms. Beene is unable to make out a prima facie case with regard to her second suspension.

■ Finally, Ms. Beene has not established that similarly situated nurses, with comparable histories of disciplinary trouble, were treated more favorably than she when they mixed up two or more patient's telemetry strips. Ms. Beene asserts that Todd Niles, a registered nurse, was leniently disciplined when he put a telemetry strip on the wrong patient's medical chart, while she was discharged. But Mr. Niles immediately caught his error, and brought it to the attention of his supervisor, so that it could be corrected. Ms. Beene never caught her mistake. In fact, the patient's doctor scheduled invasive surgery based on the wrong telemetry results, and the surgery only was cancelled after Ms. Baumgartner discovered Ms. Beene's error.

Further, there is no evidence suggesting that Mr. Niles previously had been disciplined for mistakes on the job, as had Ms. Beene. This is significant. The decision to discharge Ms. Beene was influenced by her pattern of poor work performance.

Thus, Mr. Niles and Ms. Beene are not comparable.

Aside from Mr. Niles, Ms. Beene has not adduced evidence of other nurses mixing up telemetry strips and receiving lenient treatment by Ms. Baumgartner. Accordingly, Ms. Beene has not carried her prima facie burden with regard to her discharge.

### B. Pretext

Even if Ms. Beene had set forth a prima facie case of discriminatory treatment, defendants nevertheless prevail on summary judgment because she has failed to show that the asserted non-discriminatory reasons for suspending and/or firing her were pretextual.

■ In employment discrimination cases arising from disciplinary action (as is the case here), the sole issue is whether the employer had a good faith belief that the employee committed the infraction. *Electronic Data Systems*, 1996 WL 99311 at *6. *See also Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir.1985) (upholding discharge based on disciplinary infraction even though plaintiff flatly denied any misconduct); *Johnson v. J.C. Penney, Co.*, 876 F.Supp. 135 (N.D.Tex. 1995) (same); *Garrison v. Maryland*, 850 F.Supp. 366 (D.Md.1994) (same); *Pugh v. Wisconsin Dept. of Natural Resources*, 749 F.Supp. 205 (E.D.Wis.1990) (same). Thus, absent evidence that the employer manufactured an infraction to cover up discriminatory motive, a mere dispute as to why the employee actually committed the underlying infraction is insufficient to go to trial.

Ms. Beene committed a series of errors that, in one case, may have contributed to the death of a patient. There is no dispute that these errors occurred and that they violated hospital policy. Moreover, Ms. Beene falsified medical charts, concealing her conduct from review by her supervisors.

In the face of these life-threatening violations of hospital policy, Ms. Beene was able to defend her actions and argue for

less severe punishment through the hospital's grievance procedures. In each instance, the Grievance Review Panel, which consisted of fellow employees, upheld the discipline imposed by Ms. Baumgartner. Ms. Beene also was able to appeal the discharge to a neutral arbitrator, who found that the discharge was warranted.

In sum, Ms. Beene has failed to show that defendants' proffered non-discriminatory reasons for disciplining her were false, or that discrimination was the real reason for her suspension and discharge. Without any evidence that defendants manufactured Ms. Beene's errors to cover up discriminatory motive, Ms. Beene can not establish that she was suspended and/or discharged because of her race.

## II. Retaliation

■ In examining Ms. Beene's claim of retaliatory discharge, the *McDonnell Douglas* analytical sequence applies. First, Ms. Beene must set forth a prima facie case of retaliatory discharge, which requires that she prove that 1) she engaged in an activity (filing an EEOC complaint) protected by Title VII, 2) her engagement in a protected activity was known to defendants, 3) defendants took employment action adverse to her, and 4) there was a causal connection between the protected activity and the adverse employment action. *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). If Ms. Beene can satisfy her prima facie burden, defendants then must articulate some legitimate, non-discriminatory reason for taking adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Should defendants do so, Ms. Beene must show that the proffered non-discriminatory reason is a pretext. *Canitia*, 903 F.2d at 1066.

Here, defendants argue that Ms. Beene has not satisfied her prima facie burden and, even if she could, she cannot rebut their non-discriminatory reason for firing her. I agree.

■ Plaintiff cannot satisfy her prima facie burden of reprisal because she cannot show that there is a causal link between her earlier filed EEOC complaints and her firing due to poor work performance. A causal link requires a plaintiff to proffer evidence "sufficient to raise the inference that his [engagement in a] protected activity was the likely reason for the adverse action." *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982)). The fact that adverse action occurred after earlier EEOC contacts is not sufficient to support a finding of retaliation.

In this case, Ms. Beene has presented no evidence of a causal connection between her firing and her earlier complaint to the EEOC, except the unremarkable proof that she had filed the complaint prior to being discharged. This sequence does not create any inference, let alone one that is likely, that defendants' adverse action against Ms. Beene was retaliatory. Further, for the reasons expressed in Section I.B, *supra*, even if Ms. Beene could satisfy her prima facie burden, she can not rebut defendants' non-discriminatory explanation for its decision to terminate her: poor work performance. ·

## III. Intentional Infliction Of Emotional Distress

■ In Ohio, intentional infliction of emotional distress occurs when "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983). It is not enough that a defendant has acted with an intent to commit a tort, a criminal act, or to inflict emotional distress, "or even that ... [a defendant's] conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* Rather, a plaintiff must be able to show devastating injury as a consequence of intentional con-

duct so repugnant that it shocks the conscience:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* at 374–375, 453 N.E.2d 666. Whether a defendant's conduct meets this high threshold is to be judged by the objective standards of the community, not by a particular plaintiff's subjective sensibilities. *Ullmann v. Olwine, et al.*, 123 F.R.D. 237, 252 (S.D.Ohio 1987) (citing *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 462 N.E.2d 392 (1984)).

██ Having reviewed the record evidence, I am unable to find facts that would remotely reach the level of extreme and outrageous conduct required by the Ohio Supreme Court in *Yeager.* Thus, Ms. Beene's claim of intentional infliction of emotional distress shall be dismissed.

## CONCLUSION

It is, therefore,

ORDERED THAT defendants' motion for summary judgment is granted.

So ordered.