**Paul D. POLLITT, Plaintiff,**

v.

**ROADWAY EXPRESS, INC., Defendant.**

**No. C–3–00–426.**

United States District Court, S.D. Ohio, Western Division.

Sept. 27, 2002.

Marc David Mezibov, Christian A. Jenkins, Sirkin Pinales Mezibov & Schwartz, Cincinnati, OH, for Plaintiff.

Robert Joseph Hollingsworth, Curtis L. Cornett, Cors & Bassett LLC, Cincinnati, OH, for Defendant.

## DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 10)

RICE, Chief Judge.

In the underlying case, Plaintiff Paul D. Pollitt claims that his employer, Defendant Roadway Express, Inc. ("Roadway"), discriminated against him on the basis of his age and disability. He pleads four claims for relief. In Count One, he alleges age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). In Count Two, he alleges disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). In Count Three, he alleges age and disability discrimination in violation of Ohio Rev. Code § 4112.01, *et seq.* Finally, in Count Four, he alleges retaliation in violation of the ADEA, the ADA, and Ohio Rev.Code § 4112.01, *et seq.* Contending that the facts do not support a finding of discrimination or retaliation on its part, Roadway now moves for summary judgment. (*See* Doc. # 10.)

## I. *Summary*

In early January, 1999, after a nearly 17–year health-related hiatus from *all* work, Pollitt notified his employer, Roadway, that he was fit to return to work as of February 1 of that year. Having had very little contact with Pollitt over the course of the preceding 17 years, and in light of his previous health problems, Roadway expressed skepticism as to his fitness for employment. What ensued was a 17–month dispute over whether Pollitt had provided Roadway with sufficient medical evidence of his fitness for duty. Exacerbating the dispute was the fact that Roadway had removed Pollitt from its seniority list in the early 1990s, on the assumption that he was no longer employed with the company. On June 28, 2000, Pollitt was reinstated to his former position with his original seniority.

The question presented by his Complaint (Doc. # 1) is whether that 17–month "delay" was the product of age or disability-based animus, on the part of Roadway, or was, rather, merely the result of Roadway's legitimate expectation that he provide a detailed accounting of his health, with particular regard for the specific injuries for which he had applied for workers' compensation benefits during his extended period of unemployment.

For the reasons which follow, the Court finds that there are genuine issues of material fact, such that reasonable persons could disagree on whether Roadway discriminated against Pollitt on the basis of age and/or disability. Accordingly, Roadway's Motion for Summary Judgment shall be OVERRULED as it relates to Pollitt's discrimination claims. As it relates to Pollitt's retaliation claim, the Court finding no genuine issue of material fact with respect thereto, Roadway's Motion shall be SUSTAINED.

## II. *Factual Background*

Roadway is an international freight delivery company. (Blackert Depo. at 22.) Beginning in March of 1959, Pollitt was employed as a pickup and delivery driver ("P & D driver") and dock worker at Roadway's Dayton terminal. (*Id.* at 23; Pollitt Depo. at 27.) As a P & D driver, his job duties included picking up and delivering freight from and to customers in the Dayton area. (Blackert Depo. at 23–24.) Although Roadway as a whole employed its own interstate truck drivers (known as over-the-road carriers), its drivers working out of the Dayton terminal were exclusively local P & D drivers. (*Id.* at 22–23.)

At all relevant times, Robert Blackert was the manager of Roadway's Dayton terminal (*Id.* at 7), and John Ferrone was a Roadway manager of labor relations, serving as a Roadway regional vice president of labor relations until around 1995, and thereafter as the vice president of labor relations for the entire Roadway organization. (Ferrone Depo. at 5.) Pollitt, as with all employees in his position, was a member of the Teamsters Union, and the terms of his employment were set forth in a collective bargaining agreement known as the National Master Freight Agreement and Central Region Local Cartage and Over–the–Road, Motor Freight Supplemental Agreement ("CBA"). (Pollitt Depo. at 27–28; Ferrone Depo. at 8 & Ex. 20.) Labor disputes arising under the CBA were to be decided by the Ohio Joint State Grievance Committee ("OJSGC"). Pension and unemployment welfare benefits were offered by the Teamsters through the union's Central States Health and Welfare Plan ("Central States Fund"). (Pollitt Depo. at 141.)

While at Roadway, Pollitt suffered two serious industrial accidents. The first occurred in 1978 and resulted in his obtain-

ing workers' compensation benefits and missing work for about a year. (*Id.* at 132–33.) The second occurred in 1981, again resulting in his filing for workers' compensation and having to miss work for about a year. (*Id.* at 134–36, 140.) Not long after his return to work in or around March of 1982, Pollitt's physician instructed him to take off work indefinitely, which he did, until he began working for Roadway again in June of 2000. (*Id.* at 137.) He continued to receive workers' compensation benefits until some time in 1986 or 1987. (*Id.* at 154–55.) At some point in the 1980s, Pollitt applied for and received disability benefits through the Central States Fund, and continued to receive such until around the time he returned to work for Roadway in June of 2000. (*Id.* at 141–45, 372.) He also received Social Security disability benefits ("SSD") (*id.* at 147), and continued to receive such for about nine months after his return to work. (*Id.* at 148, 372.) During his absence, he was considered totally and permanently disabled. (*Id.* at 371–72.)

Between 1982 and 1989, Pollitt, then living in Florida, did not work, and did not engage in any rigorous physical activity, on account of his physical condition. (*Id.* at 157–60.) On several occasions during that time, he contacted Blackert. (*Id.* at 41 & 44; Blackert Depo. at 5, 7–8.) These contacts concerned workers' compensation issues, and Blackert told him to communicate exclusively with Roadway's workers' compensation department and the company's attorneys.[1] (Pollitt Depo. at 41–46, 173–74.) In June of 1986, Pollitt filed a

claim for permanent and total disability benefits through the Ohio workers' compensation system. (*Id.* at Ex. 16, at Bates-stamped doc. # s 02327–02329.) For reasons not explained to the Court, the Ohio Industrial Commission did not rule on this claim until 1994. (*Id.*) In 1991, at the suggestion of Roadway, Pollitt visited a Dr. Schneider, in St. Petersburg, Florida, who recommended that he try to rehabilitate himself. (*Id.* at 160–64.) Dr. Schneider identified 17 separate ailments of which Pollitt complained, and stated that it was his medical opinion that Pollitt was "permanently and totally impaired." (*Id.* at Ex. 6, at Bates-stamped doc. # s 03043–03045.)[2] However, Dr. Schneider opined that only 25% of Pollitt's physical impairments was related to his two prior work-related industrial accidents, and that, therefore, he was not totally disabled on account of his work-related injuries. (*Id.*) On the basis of Dr. Schneider's medical opinion and report, the Industrial Commission, in 1994, denied Pollitt's 1986 benefits claim for permanent and total disability benefits. (*Id.* at Ex. 16, at Bates-stamped doc. # 02329.) Therefore, Pollitt did not undergo rehabilitation at that time. (*Id.* at 162 & 164.)

Meanwhile, also in the early 1990s, Roadway management was directed by its workers' compensation department to remove Pollitt from its seniority list. (Blackert Depo. at 37–39.) Under Article 43 of the CBA, an employee's seniority can be broken only by "discharge, voluntary quit, normal retirement, or more than a five (5)

---

1. At the time in question, Roadway was a self-insured employer, which, generally speaking, means that it bore the onus of compensating injured employees from its own workers' compensation fund. *See* Ohio Rev.Code § 4123.35(B). Until about 1995, Roadway maintained its own workers' compensation department for the purpose of administering such affairs, but subsequently outsourced the

administration of such to a third-party administrator. (Blackert Depo. at 32.)

2. Exhibit 6 of Pollitt's Deposition is a collection of documents assembled by Pollitt in connection with proceedings before the OJSGC on February 18, 1999, held pursuant to a grievance filed by Pollitt. (*See* Pollitt Depo. at 227 & 228.)

year layoff." (Ferrone Depo. at Ex. 20, at 168.) There is no dispute that Pollitt was never discharged or laid off, and Roadway has no documentation that he ever quit or retired. (*Id.* at 13–15; Blackert Depo. at 74 & 76.) There is also no question that Roadway never notified Pollitt that his name had been removed from the seniority list. (Ferrone Depo. at 13–15; Pollitt Depo. at 178 & 182.) Roadway management simply "assumed" that its workers' compensation department had a bona fide reason for directing it to remove him in such fashion. (Ferrone Depo. at 13.)

In 1995, another physician, Dr. Ronald Grove, recommended that Pollitt receive physical rehabilitation, but he was again denied workers' compensation benefits. (Pollitt Depo. at 164–65.) In 1998, although he did not receive workers' compensation benefits to cover the cost,[3] Pollitt began rehabilitation treatment, which continued until the end of 1998, at which time Dr. Ronald Grove released him with a clean bill of health and permission to return to work beginning February 1, 1999. (*Id.* at 165–70 & Ex. 5, at Bates-stamped doc. # 02012.)[4]

Upon receiving his medical release, Pollitt contacted his union representative, Doug Davis, who in turn told him to contact Blackert. (*Id.* at 174–75.) At Blackert's request, Pollitt faxed him a copy of Dr. Ronald Grove's release, but did not hear back from him before February 1. (*Id.* at 176, 178.) Of his own volition, on January 26, 1999, Pollitt received and passed a physical evaluation from a medical group regularly utilized by Roadway for purposes of evaluating the fitness of its drivers and assuring they satisfy certain conditions imposed upon truck drivers by the Ohio Department of Transportation. (*Id.* at 178–80; Blackert Depo. at 59–60 & Ex. 3.) Then, on February 1, he reported to work at Roadway, where he was told by Blackert that he had been taken off the seniority list and did not have a job. (Pollitt Depo. at 181–82.) Prior to that point in time, Pollitt had never been notified that he had been removed from the seniority list. (*Id.* at 178 & 182.) Blackert told him that Roadway had not notified him of the fact because it did not know his whereabouts. (*Id.* at 183.) Around that same time, Blackert told another employee that Pollitt would "never step foot" on Roadway property again. (Bolton Aff., attached to Doc. # 15, ¶ 3.)

Generally, when Roadway drivers take leave from work due to work-related injuries, they retain their seniority status. (Blackert Depo. at 27.) Upon an injured employee's return to work, Roadway retains the right, under Article 47 of the CBA, to require an employee to undergo an evaluation by a physician of its choosing. (*Id.* at 20; Ferrone Depo. at 22–23 & Ex. 20, at 179.) If he desires, the employee can obtain a second opinion from a physician of the union's choosing. In the event of a disagreement between the two physicians, they are to select jointly a third physician to examine the employee, and his or her diagnosis of the employee's fitness is final and binding on all parties. (Ferrone Depo. at Ex. 20, at 179.) Typically, Roadway either accepts the returning employee's medical release, and reinstates him, or directs him to a physician of its own choosing if it thinks further evaluations are necessary. (Blackert Depo. at 20.)

---

**3.** Pollitt "thinks" that his rehabilitation was covered by SSD benefits. (Pollitt Depo. at 167.)

**4.** Exhibit 5 of Pollitt's Deposition is a separate collection of documents, also assembled by Pollitt in connection with the proceedings before the OJSGC on February 18, 1999. (*See* Pollitt Depo. at 221–24.)

Interpreting Roadway's stance with respect to his employment status as a violation of the CBA, Pollitt filed a grievance with the OJSGC on February 3, seeking reinstatement of his seniority status along with wages and benefits as of February 1, 1999. (Pollitt Depo. at Ex. 5, at Bates-stamped doc. # 02011.) In the same grievance, Pollitt charged Roadway with violating his rights under the ADA, also in violation of the CBA. (*Id.*) [5]

At a hearing held on the grievance on February 18, 1999, the following statement was given by Ferrone, on behalf of Roadway (the emphasized portions are those which are cited by Pollitt in support of his argument against summary judgment):

Well you see, Mr. Pollitt went off on some sort of an injury and we haven't heard from him in about 18 years. *And, so in 1987, I guess it was, he filed for permanent disability and then again in 1991 or 1992, somewhere along those lines,* and never, ever talked to us about anything other than the fact that *all the information that we got that said that he was permanently, totally disabled and could never, ever return to work and we removed his name from the seniority list.* Haven't heard from him. Called us one day and said I'll be back to work on such and such day, give me a starting time. So we did remove his name from the seniority list. We feel he has no seniority at Roadway Express. I believe 1991 and have no contact with him whatsoever. Didn't tell us that he was on any type of therapy or anything of this nature and just shows up one day and says here I am, after 18 years. I'm totally rehabilitated, on some miracle drug and ready to go back to work. It's our opinion that if this individual was on some type of therapy or was going through some type of program and had any intentions of going to work that he had an obligation to notify us, which he did not do. We're in a situation right now where we've got fifteen people on layoff status, really doesn't make any difference to this particular case, but this guy in my opinion has got no seniority with Roadway Express. We told him that, said you have no job here. Fine. After we haven't heard from him he just shows up one day. So I have no idea. No information. He's got no information. When he showed up for work that day wanting to know when his starting time, with no ... [ellipses in original] *this guy's had extensive physicals, he's got a lot of degenerative parts of his body. Matter of fact the release that he showed up with that he gave us was the same doctor that seven or eight years before had said he's 100% disabled. Would never, ever return to work.* [6] Couldn't lift over 10 pounds over his head. No that's from us going back reviewing the reports that he's had through Worker's Comp. But he just simply shows up with a physical from the same guy and says he's under years of rehabilitation. We asked him what he'd been doing in rehabilitation, rehabilitating in Florida for 18 years or so, right? And now after all these years he decides to go to physical therapy. So, I don't know. If he had this release now

---

**5.** Article 37 of the CBA incorporates the terms of the ADA. (Ferrone Depo. at Ex. 20, at 140.)

**6.** Ferrone's reference to "the same doctor" appears to be a reference to Dr. Ronald Grove, who, according to the Industrial Commission's 1994 ruling on Pollitt's 1986 claim for workers' compensation, stated in 1989 that Pollitt was "100% permanently and totally disabled." (Pollitt Depo. at Ex. 16, at Bates-stamped doc. # 02338.) At the time it issued its ruling, the Industrial Commission discounted Dr. Ronald Grove's opinion in light of Dr. Schneider's opinion that only 25% of Pollitt's disability could be attributed to his work-related injuries. (*Id.*)

he may have had this release seven, eight or nine years ago and what do you do, you just get lost for 10 years and all of a sudden show up one day when you're 62 years old? *I thought as you got older your body deteriorated. This guy, as he got older he turned into a piece of steel, evidently.* From what we've got. It's our opinion that if anything, he's doing nothing but playing some sort of a game. He's looking for something that he's not entitled to. If he was entitled to something along these lines, he would have been entitled to it fifteen years ago. He had plenty of time to rehabilitate. He had plenty of time to take physical therapy. We have no release from this guy stating that all of these x's that he's got on his body that they've healed completely. And *if he's as bad as his doctor's [sic] have said he's been over the years, the same doctor that said he's ok, there's no doubt in our mind that what's going to happen to this guy on his first day out he's going to crash and we're going to be subject with another problem.* So yes, yes, we told him he had no seniority with Roadway. We don't believe he has any seniority with Roadway. And that's by his own doing. *So after years and years, in 1992 or something, I believe it was 1992, after he filed for permanent disability, again, and was denied, when he was denied that, and he was, by his own records stating that he was 100% disabled, when we got that word, on that day, we removed him from our seniority list.* Took him off the seniority list. Have not heard from him since that time up 'til today, when *he found all these miracle drugs or whatever he's got. Whatever he's taking to heal his body I'd like to have some, if he could let us all know, we could live to be 1,000'.* It's our position that this guy has no seniority. You cannot go someplace for an extended period of time with not notifying the Company or the Union. We have not heard anything from the Union, telling us that this guy was coming back or was in rehabilitation, until the same time he called us. So evidently he wasn't in contact with them either. And we don't think that the contract or any job provides for someone to simply take a seven or eight year vacation, and then decide after all this period of time, now I think I'll go to physical therapy for two months and then get well and then come back and then pick up everything that he had, five weeks vacation, and these other goodies and the top dollar for nothing. And we don't think that any contract or any job provides for that. If this individual had an ongoing problem and notified us as to what his problem was so we could track it and be part of it, that was one thing. That did not happen. That did not happen. We have the same manager who had been there all these years. So it isn't like he didn't know who he was doing business with. Gentlemen, it's our position that this is nothing more than a sham and if he could have got physical therapy, if he could have got rehabilitated, he could have done this ten years ago or twelve years ago. And he has no seniority with Roadway. *He is not an employee who should be working on that facility.* He's not somebody that we should be putting on that dock, taking a job away from somebody whose worked very, very hard. That's our case in a nutshell. We have no documentation from this individual other than what *you've read that the same doctor who said he was 100% disabled back in 1987 and again in 1992 is now saying he's a fine specimen of health and he can not only lift 10 pounds over his head, he can lift 100 pounds over his head. That the situation.* That's what happened in the case and that's all we know about it, because

we asked him for full documentation, everything along these lines which he has provided us with nothing. All he said was, I'm rehabilitated, I've been rehabilitated and have been to physical therapy and now I'm here and I'm ready to go back to work. That's our position gentlemen. We don't think this guy has anything, any seniority at the Dayton facility.

(*Id.* at Ex. 1, at 5–9.)

Ferrone added, in reference to Dr. Schneider's 1991 report, the following comments:

1991 he said he was going to go into rehab. He decided to do that in 1998. Gentleman [sic], I don't believe that this contract or any other contract or anything that we do business with every day allows an individual to totally get lost for the period of time that he had been. Now lets [sic] just go back to his last evaluation, I guess, before the Industrial Commission, and that was in 1992. 1992–1998. Seven years and he brings a doctor's release in from the same doctor that says that he was totally, 100% disabled and got all this medical equipment from the stair stepper in his room, or whatever he got, that he could work on in his house. If he could done this when he was, he's in his sixties I think he's the same, close to the same age as I am, sixty one or sixty two, if he could have done this, he could have done this a hell of lot easier when at the age of 54. He elected not to do that. Now all of a sudden, after all of his positions, going back before the Industrial Commission, has said over and over again, that he's 100% disabled, he just shows up one day and says I want to go back to work and where is my starting time and that's the only explanation. Now, I just read to you seventeen things that he reported wrong with him. Now, we are a self-insured carrier, this doctor's release that he brought to us is if [sic] course totally

unacceptable. *We don't feel that he has done anything to rehabilitate himself and we don't feel that it is proper that any company for any reason should have to carry an individual like this on a seniority list* where he could just simply come back eight or nine years later, or in this particular case, eighteen years later, and go right to the top of the seniority list and knock somebody out of a job when he did absolutely nothing, nothing to correct his problem that he had. If he could have corrected the problem in 1998, he could have corrected the problem at least in 1992, after he went before the Ohio State Commission. And they said that he was, that he wanted to be rehabilitated. Now, that's our case. *No, no, did we send him a letter removing his name from the seniority list? The answer to that is no we did not. We never said we did.* We removed his name from the seniority list because all of the information we got back from the doctors and him being on pension, said that he would never, ever be back to work. Never, ever, ever be back to work. And he went back before this Commission on several occasions. We were not there. This manager was not there. This is the same guy that he worked for. This guys [sic] been at Dayton for, I've been with Roadway for twenty years, he's the guy that picked me up from the airport and took me to Cincinnati, showed me where my office was. So, that's how long he's been there. He's not a stranger to Mr. Pollitt. He's not a stranger to Mr. Weinert, who was there at that time, working in Dayton. Doug was not, but the bottom line is this, he had no conversation with this local union because they would have called us. Had no discussion about ADA. Had no discussion about he wanted special consideration from Roadway to look into his problems. None

whatsoever. All he did, all he did, was, for some reason, he decided to rehabilitate himself and come back to work. And I think, in my opinion, before is the same as it is now, if he could have done it in 1998, he could have done it back in 1987 or whatever the case may be. I don't feel that this guys [sic] got any seniority. I don't feel he deserves any seniority. None whatsoever. I don't feel that he has a right to replace the last guy we've got on our seniority list at Dayton, Ohio or any other facility. And that's the Company's position and that's our position.

(*Id.* at Ex. 1, at 39–41.)[7]

At the conclusion of the hearing, the OJSGC ruled that the dispute was exclusively over the issue of seniority, and governed by Article 43 of the CBA (Ferrone Depo. at Ex. 20, at 168), and that there was no ADA issue to consider. Despite this ruling, nowhere in its decision did it expressly rule on the seniority issue.[8] Indeed, its sole ruling was that Pollitt should provide Roadway with a detailed medical release. (*Id.* at Ex. 1, at 53–54.) Following the February 18 hearing, Pollitt provided Roadway with another medical release form from Dr. Jeffrey Grove, Dr. Ronald Grove's son, but a dispute soon arose as to whether said medical release satisfied the conditions of the OJSGC's February 18 decision. (Pollitt Depo. at Ex. 6, at Bates-stamped doc. # 03049; *id.* at Ex. 2.) In particular, Roadway objected to the fact that the release provided by Dr. Jeffrey Grove did not address the 17 ailments of which he had complained to Dr. Schneider in 1991, as addressed in the Industrial Commission's 1994 ruling on Pollitt's 1986 application for workers' compensation benefits. (*Id.* at Ex. 2, at 5–9.)[9] A third favorable medical evaluation, pro-

7. Exhibit 1 of Pollitt's Deposition is a written transcript of the proceedings before the OJSGC on February 18, 1999. (A copy of the same transcript is attached to Blackert's Deposition as Exhibit 17.) Throughout his deposition, Pollitt disputes the accuracy of this transcript, the accuracy and authenticity of which was not sworn to by a notary. At the same time, he cites significant portions of Ferrone's purported statements made to the OJSGC, as reported in the transcript. Having reviewed Pollitt's deposition, the Court can note that his primary concern is that the transcript does not reflect a particular statement allegedly made by Ferrone, which, if truly made, would constitute direct evidence of age discrimination. However, because Pollitt attests to the making of the statement in question, which the Court will address below, the apparent deficiency of the transcript has been eliminated for present evidentiary purposes. *See* Fed.R.Evid. 801(d)(2). There being no other complaints about the transcript, the Court will assume, for purposes of establishing the factual background to this litigation, that the February 18 hearing proceeded as depicted therein.

8. One might infer from its decision that the OJSGC determined that Roadway's revocation of Pollitt's seniority was done in error, and that the purpose for directing Pollitt to provide Roadway access to his medical records was to pave the way for Pollitt to return to work with fully reinstated seniority. This certainly seems clear from the context of the events as they unfolded. For example, Blackert acknowledged that Roadway reinstated Pollitt with full seniority, due in part to the fact that it could not document why he had been removed from the seniority list in the first place. (Blackert Depo. at 74–76.) Ferrone also admitted that Roadway "lost" on the seniority issue. (Ferrone Depo. at 74.) Nevertheless, no ruling to this effect was ever expressly stated by the OJSGC, and it is lost on this Court how the state of an employee's health in 1999, though certainly relevant to whether he should be allowed back to work, is at all relevant to a dispute over whether the procedure taken for removing that employee from the seniority list in 1991 was correct in the first instance. They would appear to be two separate issues.

9. Exhibit 2 of Pollitt's Deposition is a written transcript of proceedings before the OJSGC on April 15, 1999.

vided by a Dr. Long, of Dayton (*Id.* at 230–35 & Ex. 6, at Bates-stamped doc. # 03050), also failed to assuage Roadway of its misgivings, because again, it did not address the 17 ailments dating back to 1991. (*Id.* at 240; Ferrone Depo. at 55–56.) It made this objection even though the OJSGC made no mention of Dr. Schneider's 1991 report in its decision. Indeed, at the time Pollitt presented Roadway with his third medical release, from Dr. Long, dated March 10, 1999, Roadway was aware that Pollitt did not even have a copy of Dr. Schneider's 1991 report enumerating the 17 ailments of which he had then complained. (Pollitt Depo. at Ex. 7; Blackert Depo. at 101.)

In early April, 1999, Roadway wrote to the OJSGC, stating that Pollitt was refusing to comply with the terms of the February 18 decision. (Blackert Depo. at Ex. 7.) In response, Pollitt renewed his grievance with the OJSGC, which then heard additional arguments on the matter on April 15. At the conclusion of the April 15 hearing, the OJSGC ruled in favor of Roadway that Pollitt was obligated to provide a medical release giving Roadway the "authority to converse with his doctors relative to all 17 items listed in the Workmen's Compensation report made a part of the previous record." (Pollitt Depo. at Ex. 2, at 24–25.)

Following the April 15 hearing, Pollitt drafted his own release of information form, authorizing Dr. Long to discuss the 17 specific ailments addressed in Dr. Schneider's 1991 report with a single physician from the medical group regularly used by Roadway (and from where Pollitt had received his physical on January 26, 1999). (*Id.* at 243 & Ex. 8, at Bates-stamped doc. # 01908.) In addition, Dr. Long wrote to Roadway that he had reviewed Dr. Schneider's 1991 report, and that, in his medical opinion, none of the 17 ailments of which Pollitt had then com-

plained would prevent him (Pollitt) from returning to work for Roadway. (*Id.* at Ex. 8, at Bates-stamped doc. # 01909; Blackert Depo. at 97–98.) Again, Roadway rejected the release, this time because it limited its ability to obtain medical information from Dr. Ronald Grove and his son Dr. Jeffrey Grove, and from Dr. Schneider. (Ferrone Depo. at 68; Pollitt Depo. at Ex. 10.) Furthermore, Roadway did not believe that Dr. Long's correspondence addressed the 17 ailments in sufficient detail. (Ferrone Depo. at 71–72.) The parties therefore went back before the OJSGC, on May 21, 1999, at which time Pollitt signed a release authorizing Roadway's physician to discuss his medical history with Drs. Ronald and Jeffrey Grove, and Schneider. (Pollitt Depo. at 260–63 & Exs. 3 & 10.)

The dispute expanded after May 21 to the question of whether Roadway was entitled to physical records. (*Id.* at 268.) Pollitt had not authorized the physical release of any medical records. (*Id.* at 268, 273 & Ex. 12.) Thus, on July 15, 1999, the parties returned to the OJSGC to have it determine whether Pollitt was required to do so per the terms of the preceding decisions. (*Id.* at Ex. 4.) At that time, adding frustration to Pollitt's cause, Roadway produced a letter, dated July 1, 1999, from a Dr. Howard, a physician utilized by Roadway, in which Dr. Howard reported to Roadway that he had conversed with Dr. Jeffrey Grove and Dr. Long, and that he had been informed by Dr. Long that he had been unaware that Pollitt's duties at Roadway would include heavy lifting, and that he had not taken such into account in authorizing Pollitt to return to work. (*Id.* at Ex. 4, at 15–16; *id.* at Ex. 13.) Dr. Howard also noted that Dr. Jeffrey Grove had not actually examined Pollitt, but that he, too, upon an examination of Dr. Ronald Grove's chart on Pollitt, had opined that Pollitt could not perform heavy work for prolonged periods. (*Id.* at Ex. 13.)

Therefore, Dr. Howard expressed his opinion to Roadway that there was a "strong probability" that Pollitt would suffer further injury if allowed to return to work, and that he should undergo "thorough examination and testing" before Roadway allowed any such return. (*Id.*) Pollitt, not having been shown a copy of Dr. Howard's letter prior to the July 15 hearing, and caught off guard by the production of same, withdrew his grievance. (*Id.* at Ex. 4, at 18.)

Throughout the several proceedings, the OJSGC never made express findings of fact. Furthermore, at each stage of the grievance prior to its withdrawal on July 15, 1999, the OJSGC stated that the dispute remained open and unresolved. (*Id.* at Ex. 1, at 54; *id.* at Ex. 2, at 24; *id.* at Ex. 3, at Bates-stamped doc. # 03069.)

Following Pollitt's withdrawal of his grievance, Roadway was of the belief that it owed no duty to Pollitt to facilitate further his return to work. (Ferrone Depo. at 88–91; Blackert Depo. at 116.) Furthermore, regardless of what Pollitt intended to do, Roadway maintained its position that until he provided a statement from one of his physicians addressing the 17 ailments enumerated in Dr. Schneider's 1991 report, and finding him fit to perform all of the functions of his job at Roadway, it would not allow him to return to work. (Ferrone Depo. at 87–92.) For his part, Pollitt attempted to verify the assertions in Dr. Howard's letter. Although Pollitt could not verify whether Dr. Jeffrey Grove stated those opinions ascribed to him by Dr. Howard (Pollitt Depo. at 275–78), he recalled that those opinions ascribed to Dr. Long had been distorted by Dr. Howard. (*Id.* at 278.) Indeed, Dr. Long memorialized in a writing the fact that at no time did he tell Dr. Howard that Pollitt was not fit to return to work (*id.* at Ex. 14), and Pollitt delivered a copy of this writing to Roadway (*id.* at 278), which offered no

response. (Ferrone Depo. at 93; Blackert Depo. at 117–18.)

In November, 1999, Pollitt filed an EEOC complaint. (Compl. at Ex. A; Ferrone Depo. at 102; Blackert Depo. at 129–30.) Around the same time, Pollitt retained legal counsel, which, upon contacting Roadway, was informed that Pollitt could return to work only if he could demonstrate his fitness for duty. (Jenkins Aff., attached to Doc. # 15, ¶ 9.) In March, 2000, Pollitt underwent a thorough physical evaluation by Dr. Michael Pedoto, and presented Dr. Pedoto's report to Roadway. (Blackert Depo. at 130 & Ex. 19.) After several months went by without it hearing from Roadway, counsel for Pollitt learned, in June of 2000, that Roadway had directed Pollitt to undergo a more extensive physical evaluation at the Cleveland Clinic. (Jenkins Aff. ¶¶ 10 & 11; *id.* at Exs. H, I & J; Blackert Depo. at 130; Ferrone Depo. at 105.) The Cleveland Clinic examination was completed as of June 15, and Pollitt returned to work on June 28. (Jenkins Aff ¶ 12.)

Shortly after his return to work, Blackert told another employee that Pollitt would not be back "for long." (Bolton Aff. ¶ 4.) Furthermore, for several months following his return, Pollitt experienced a hostile work environment. (Pollitt Depo. at 52–120.) Blackert retired in December, 2000, and since that time Pollitt has gotten along favorably with Blackert's replacement, Marty Pond. (*Id.* at 70–71.)

### III. *Position of the Parties*

Pollitt claims that Roadway discriminated against him on the basis of his age and perceived disability, in violation of the ADEA and ADA, respectively, by not reinstating him to his former position until June 28, 2000, nearly 17 months after he first sought reinstatement. Pollitt's allegations that he was the subject of discrimi-

nation are not limited to a single point in time, and include: Roadway's refusal to reinstate him on February 1, 1999, even though he had provided it with a medical release from Dr. Ronald Grove; Roadway's repeated refusal to reinstate him after he provided follow-up medical releases from Dr. Jeffrey Grove and Dr. Long; Roadway's submission of the allegedly misleading statements of Dr. Howard to the OJSGC; Roadway's refusal to have him examined by a physician of its· own choosing until it received what it considered to be a sufficient medical release from one of his physicians; Roadway's insistence that any such medical release specifically address each of the 17 ailments of which he complained to Dr. Schneider in 1991; Roadway's delay in scheduling his physical at the Cleveland Clinic even after it was finally satisfied that his earlier ailments had been addressed in sufficient fashion by Dr. Pedoto; and Roadway's two-week delay in reinstating him even after he successfully completed his physical at the Cleveland Clinic. He also claims that he was subject to harassment upon his return to work in retaliation for his having filed the EEOC complaint.

Roadway contends that it refused to reinstate Pollitt initially because of the fact that he had been removed from the seniority list around 1991, and therefore was not considered an employee, and, furthermore, because it did not consider the medical release signed by Dr. Ronald Grove to address sufficiently his past ailments. Conceding that on the basis of the OJSGC decision of February 18, 1999, it could no longer maintain its argument that it had removed Pollitt from the seniority list in a proper manner, it argues that thereafter it refused to reinstate him, because he failed to provide sufficient medical documentation of his health. It contends that it reinstated him after he finally complied with the letter of the OJSGC decision, and that it did so in a timely fashion. It

argues further Pollitt has not adduced any evidence of actionable retaliation.

## IV. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together,

*Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## V. *Analysis*

Under the ADA, an employer cannot discriminate against a "qualified individual with a disability" because of that disability. *See* 42 U.S.C. § 12112(a). A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the em-

ployment position that such individual holds or desires." *Id.* § 12111(8). "Disability" means:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

*Id.* § 12102(2). Under the ADEA, an employer cannot discriminate against an employee on the basis of age if the employee is at least 40 years of age. *See* 29 U.S.C. §§ 623(a) & 631(a).

In this case, there is no question that Pollitt was above the age of 40 when the alleged discrimination transpired. Regarding his alleged disability, he does not contend that he is actually disabled. Rather, his claim of disability is raised under 42 U.S.C. § 12111(8)(B) & (C), on the basis that he has a known record of being disabled, and that Roadway regarded him as disabled. (*See* Doc. # 15 at 25–26.)

With regard to burdens of proof, the Sixth Circuit has stated:

An employee may prove discrimination based on his or her disability in two ways. The first is by putting forward direct evidence that the defendant had a discriminatory motive in carrying out its employment decision. *See Robinson v. Runyon*, 149 F.3d 507, 512–14 (6th Cir. 1998) (discussing the difference between direct versus circumstantial proof in a Title VII case). Such evidence would take the form, for example, of an employer telling an employee, "I fired you because you are disabled." Because "rarely will there be direct evidence from the lips of the defendant proclaiming his or her ... animus," *id.*, employees have a second method to prove discrimination: the indirect burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir.1998). The same approach applies to claims brought under the ADEA. *See Oil, Chemical and Atomic Workers Int'l Union v. RMI Titanium Co.*, 199 F.3d 881, 889–90 (6th Cir.2000).

Where a plaintiff creates a genuine issue of material fact as to the existence of "direct evidence" of discrimination, summary judgment may not be granted. *See, e.g., Johnson v. University of Cincinnati*, 215 F.3d 561, 577 (6th Cir.) (holding that direct evidence of race discrimination presented a genuine issue of fact for the trier of fact to decide), *cert. denied* 531 U.S. 1052, 121 S.Ct. 657, 148 L.Ed.2d 560 (2000). Alternatively, where the plaintiff must prove her case with "indirect evidence" of discrimination, under the *McDonnell Douglas* approach, she must first make a prima facie showing of discrimination. If she can do this, she "in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted). In that case, the burden of producing evidence of a non-discriminatory reason for the adverse decision falls on the defendant employer. *See id.* at 506–07, 113 S.Ct. 2742. This is merely a production burden, not a persuasion burden. *See id.* at 507, 113 S.Ct. 2742. In the event the defendant fails to meet its burden of production, the presumption created by the plaintiff's prima facie case requires a finding for the plaintiff. *See id.* at 506, 113 S.Ct. 2742. If, however, the defendant proffers such a justification, while an *inference* of discrimination may still be drawn from the plaintiff's prima facie evidence, the mandatory *presumption* of discrimination drops from the case. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). It

then falls on the plaintiff to rebut the defendant's proffered justification by showing that it is mere pretext. Generally, the plaintiff can meet this burden in one of three ways. To raise a genuine issue of material fact about the credibility of his employer's explanation (i.e., to show pretext), the plaintiff must show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer to take the adverse action, or (3) that the proffered reasons were insufficient to motivate the taking of the adverse action. *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994).

Both of the parties herein place significant emphasis on the proceedings before the OJSGC. Pollitt reiterates time and time again that Ferrone's comments about his age and health, made during the hearing on February 18, 1999, should be understood as direct evidence of age and disability discrimination. He also argues that the OJSGC ruled that Roadway erroneously removed him from its seniority list, and that this, too, is direct evidence of discrimination. *See supra* note 8. Roadway, for its part, contends that the OJSGC repeatedly ruled that Pollitt had failed to provide Roadway with access to his medical records, such that its refusal to allow him to return to work until he complied with the decisions was perfectly legitimate, and supports its overarching argument that it had legitimate grounds for doubting Pollitt's fitness, even though he ultimately proved to be healthy.

Although the Court may treat statements made during the OJSGC proceedings as prior admissions of party opponents, *see* Fed.R.Evid. 801(d)(2), the actual decisions of that body are of limited relevance. The OJSGC was utilized, as required by the CBA, to settle a labor contract dispute. The question before the OJSGC was whether Roadway violated the CBA by removing Pollitt from its seniority list in the early 1990s. While it is true that in the course of those proceedings, the OJSGC proceeded to consider a secondary issue of whether Pollitt had provided Roadway with sufficient documentation of his good health, it never invoked the ADA or the ADEA as a basis for any of its decisions, and it certainly did not have in front of it all of the facts that are now before this Court. Indeed, Article 37 of the CBA even states that "whether the Employer has complied with the ADA's statutory requirements shall not be subject to the grievance procedure." (Ferrone Depo. at Ex. 20, at 140.) In any event, the contractual issue therein, i.e., the question of seniority, is not at issue before this Court. The case at bar is in no manner an appeal of any decision issued by the OJSGC, and there is no reason for this Court to defer to any decisions or rulings of that body, which related exclusively to Pollitt's rights under the CBA.[10] At most, the Court may consider statements made by Roadway during those proceedings, by Ferrone in particular, for their probative value vis-a-vis the claims at issue herein.

10. For reasons not exactly certain to the Court, Roadway cites to cases holding that an employer cannot be required, under the ADA, to accommodate one employee at the expense of another's rights under a collective bargaining agreement, and that, therefore, this Court should defer to the decisions of the OJSGC in evaluating its actions with respect to Pollitt. (Doc. # 10 at 13–14.) Given that Roadway concedes that it erroneously removed Pollitt from the seniority list, it seems to the Court that it cannot argue that his reinstatement would have encroached upon the rights of another worker. Whether Pollitt was fit to return to duty before June 28, 2000, was, at least after February 18, 1999, an issue between him and Roadway only.

In moving for summary judgment, Roadway contends, simply, that there is no evidence of discrimination or retaliation. In opposing Roadway's Motion, Pollitt contends that there is direct evidence that Roadway discriminated against him on the basis of age and disability. He relies upon three pieces of evidence in making this argument. *First,* he recounts his own auditory observation that during the February 18, 1999, OJSGC hearing, Ferrone stated "the reason we don't want him [Pollitt] back is that he is an old man and he will fall apart." (Pollitt Depo. at 337.) *Second,* he cites excerpted portions of the statements given by Ferrone at the same hearing, as documented in the transcript of that hearing and set forth and highlighted earlier in this Decision and Entry. *Third,* he cites Roadway's Motion, wherein it states:

> Plaintiff will no doubt argue that he was treated differently than other employees. *He is right.* Roadway will certainly treat an employee totally disabled for 17 consecutive years as the result of numerous conditions differently than an employee who returns to work following a much shorter absence based on a single medical condition. (*See* Blackert Depo. at 20–22.) Such differences clearly do not show discrimination. They reflect only common sense.

(Doc. # 10 at 13 (emphasis in original).)

The Court will address his various claims in turn.

## A. *Age Discrimination Under the ADEA (Count One)*

The Court agrees that the first piece of evidence relied upon by Pollitt is direct evidence of age discrimination which creates a genuine issue of material fact and precludes summary judgment. Construing the facts in a light most favorable to Pollitt, the Court must accept as true the allegation that Ferrone stated that Roadway did not reinstate him upon his return because it felt that he would "fall apart" on account of his being an "old man." Because this statement fits neatly next to the example of direct evidence provided by the Sixth Circuit in *Smith,* 155 F.3d at 805, and assuming for the sake of ruling on summary judgment that a jury might believe Pollitt's allegation, it is plain that summary judgment would not be proper.[11]

Clearly, there are competing inferences which could be made in Roadway's favor. For example, it may be that its initial reluctance to reinstate Pollitt was due to the fact that it had removed him from his seniority list in 1991, and therefore no longer regarded him as someone who rightly could claim a job. This is a perfectly legitimate argument to raise in its defense, because the legality of Roadway's action of removing Pollitt from the seniority list in 1991, which was the purported focus of his OJSGC grievance, is not itself an issue herein.[12] It may also be

---

11. Ferrone's statement, if true, falls squarely into what the Supreme Court has called "the prohibited stereotype," that being the statement, "Older employees are likely to...." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In this case, the ellipses would be filled in with the verb phrase, "fall apart."

12. Pollitt argues in his Motion in Opposition that Roadway's initial insistence that Pollitt had "resigned" was itself an act of age-based

discrimination. (Doc. # 15 at 24.) This is an unpersuasive argument. *First,* there is no evidence that Roadway treated Pollitt as if he had resigned. Ferrone and Blackert have stated, simply, that Roadway removed Pollitt's name from the seniority list in the early 1990s at the direction of its workers' compensation department. Upon questioning, both gentlemen readily acknowledged that Roadway had no documentation that Pollitt had ever resigned. *Second,* Pollitt has not adduced any evidence that Roadway did not remove his

that Roadway simply did not like Pollitt, and that it was trying to put up roadblocks to his reinstatement on that basis. Indeed, it is perfectly reasonable to think that management might have been concerned about what effect Pollitt's reinstatement with full seniority after his lengthy absence would have on other employees', particularly if another employee would have to be laid off as a result. Because discrimination based on personal animus, as opposed to age-based animus, is not illegal under the ADEA, this, too, is a legitimate argument to raise as a defense. It may also be that Roadway's refusal to accept the medical release Pollitt submitted from Dr. Ronald Grove was based on its genuine, good faith belief that the release simply was not sufficient, and that Roadway's continued reluctance to accept Pollitt's follow-up releases provided after the February 18, 1999, OJSGC hearing owed itself to its strict adherence to what it believed to be the letter of the OJSGC's decision. Again, acting upon this basis would not be related to age or disability, and would therefore be legitimate and perfectly legal. A trier of fact might also agree that Pollitt's long absence posed a special concern to Roadway, and/or simply refuse to believe that Ferrone ever made the statement ascribed to him by Pollitt, perhaps finding credence to Roadway's argument that it is unlikely Ferrone would make derogatory comments about Pollitt's age, given the fact that he is older than Pollitt.[13]

▮ However many reasonable inferences could be drawn in Roadway's favor, they all are, of course, irrelevant to the Court in ruling on its Motion for Summary Judgment. It may be that a jury could find that Roadway had considerable and legitimate misgivings about Pollitt's ability to handle the rigors of a job he had not occupied for almost 18· years, but then it might also find that Roadway had the obligation to have him evaluated more promptly to determine if he could satisfy the requisite level of fitness. The essence of the ADEA is that "[t]he employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly." *Hazen Paper Co. v. Big-*

name from the seniority list in the early 1990s, or that its act of doing so, at that time, was motivated by age or disability-based animus. Thus, regardless of whether it properly removed his name in the first instance, Blackert's statement to Pollitt, upon his return on February 1, 1999, that his name had been removed from the seniority list was legally innocuous.

13. In *Wexler v. White's Fine Furniture, Inc.,* 246 F.3d 856, 866 (6th Cir.2001), the Sixth Circuit held that it was proper for the district court to take into consideration, in determining whether an ADEA plaintiff had set forth a prima facie case of age-based discrimination at the summary judgment stage of the litigation, the "incontrovertible counter-inference[ ]" that the manager who allegedly made the alleged discriminating statement was almost ten years older than the plaintiff. Subsequently, that decision was vacated, and was reargued before an *en banc* court on March 20, 2002. No decision has yet been issued. Other circuit courts have held that the age of the alleged discriminating individual presents a competing inference for the trier of fact to take into consideration, but not the trial court at summary judgment. *See, e.g., Kadas v. MCI Systemhouse Corp.,* 255 F.3d 359, 361 (7th Cir.2001) (Posner, J.). This Court agrees that the latter position is more consistent with other discrimination contexts. *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (" 'Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.' ") (quoting *Castaneda v. Partida,* 430 U.S. 482, 499, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)). In the absence of binding Sixth Circuit precedent, the Court will leave for the trier of fact the question of whether Ferrone's own age is of any material consequence.

*gins*, 507 U.S. 604, 611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Accordingly, to the extent it relates to Pollitt's claim of age discrimination under the ADEA (Count One), Roadway's Motion for Summary Judgment is OVERRULED.

B. *Disability Discrimination Under the ADA (Count Two)*

■ With regard to Pollitt's ADA claim, the Court disagrees with Pollitt that Ferrone's statements at the February 18, 1999, OJSGC hearing directly demonstrate that Roadway denied him reinstatement prior to June 28, 2000, because of his perceived disability. Having set forth earlier in this Decision and Entry the full text of the pertinent statements made by Ferrone, and having highlighted therein the excerpted portions of same upon which Pollitt relies, it is apparent, when said excerpts are placed back in their true context, that Ferrone's statements were not discriminatory. As noted, the issue before the OJSGC was whether Roadway had acted properly under the CBA in removing Pollitt from its seniority list in the early 1990s, and it was that issue which Ferrone was addressing. His comments were made in defense of Roadway's decision to do just that, and further in defense of its position that Pollitt's return on February 1, 1999, did nothing to change the company's opinion that he was not entitled to reinstatement. His comments regarding Pollitt's history of physical impairments were just that, comments about a record of health problems which Roadway believed, as of the early 1990s, foreclosed the possibility of his returning to work. Again, whether Roadway was correct in removing Pollitt from its seniority list is a CBA issue which is not the concern of this Court. It would be inappropriate for the Court to misconstrue Ferrone's explanation of the company's position on that issue as evidence of its feelings toward Pollitt upon his return to work in 1999.

■ The statement made by Roadway on page 13 of its Motion for Summary Judgment (Doc. # 10), in which it acknowledges that it treated Pollitt differently from other employees returning from disability leave on account of his 17–year absence and history of disability, poses a closer question. It is certainly an acknowledgment that he was treated differently on account of his long history of being disabled, but whether "different" treatment and "discriminatory" treatment mean the same thing is a different question. Under the ADA and related regulations, an employer has a right to inquire into "the ability of an employee to perform job-related functions." *See* 42 U.S.C. § 12112(d)(4)(B); 29 C.F.R. § 1630.14(c). As an additional matter, as a trucking company, Roadway has to be concerned about whether its drivers are fit under rules imposed by the Ohio Department of Transportation. (Ferrone Depo. at 24.) Indeed, Pollitt himself stated that driving a truck is "one of the most hazardous jobs there are besides a police officer." (Pollitt Depo. at 35.) On the other hand, a 17–year disability absence means nothing when taken by itself, anymore than a seven-year absence or a seven-month absence. The question is whether the employee is fit for duty, and it seems to this Court that an employer's subjective perception that a 17–year disability absence provides grounds for treating an employee differently than an absence of fewer years is exactly the sort of stereotypical thinking which the ADA seeks to prohibit. It may have been, as Roadway argues, "common sense" for it to treat Pollitt differently, but that could only been determined after it had shown, by an objective evaluation of his health, that his 17–year absence actually had the deleterious effect which it surmised it had. This Court disagrees that the length of an employee's leave of absence is relevant to the procedures utilized by the employer to

evaluate his fitness upon his return. Indeed, the fact that Pollitt proved to be fit emphasizes the central tenet of the ADA: arbitrary perceptions of one's physical ability to perform a job are not to guide an employer's decision making.

 Even if the statement at page 13 of Roadway's Motion could not be construed as "direct evidence" of discrimination, the Court finds that Pollitt has created a genuine issue of material fact under the *McDonnell Douglas* rubric. To make out a prima facie case of disability discrimination under the ADEA, the plaintiff must be able to point to, in opposing a motion for summary judgment, facts as would be admissible at trial that, when taken as true, give rise to genuine issue whether (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position at which he faced the adverse employment decision, and (4) he was treated differently than similarly situated individuals outside of the protected class. *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir.2002). The facts to which Pollitt directs the Court's attention easily raise a genuine issue as to each of these prima facie factors.

If nothing else, Ferrone's statements at the February 18, 1999, OJSGC hearing, along with the acknowledgment in Roadway's Motion that Pollitt was treated differently because of its perception that his lengthy history of being disabled made him a special case, satisfy prongs (1) and (4). Through these statements, Roadway expressly acknowledges Pollitt's history of being disabled and its perception that he was disabled, which places him within the class of individuals protected by the ADA, 42 U.S.C. § 12111(8)(B) & (C), and that he was treated differently than other similarly situated employees outside the protected class (i.e., those who returned to work after disability leave whom Roadway did not continue to perceive as being disabled).[14]

With respect to prong (2), whether a genuine issue exists as to whether Pollitt suffered an adverse employment action, which the Sixth Circuit has defined as a "materially adverse change in the terms or conditions of ... employment," *id.* (citation omitted), Roadway does not argue in its Motion that an almost 17–month delay in reinstatement would not generally be considered adverse, or even that a shorter delay in scheduling a physical with a Roadway-appointed physician, or a delay in reinstating an employee after he has proven to be fit, would not be considered adverse. Certainly, if an employee is denied the right to perform his job, and thus receive compensation and benefits, *for no legitimate reason*, said denial constitutes a material change in the terms and conditions of employment, whether

14. At his deposition, Ferrone added: "[Pollitt] does not have normal injuries. When you are gone for 18 years with as many things as he has had and been before the commission, I just don't think that's normal. It may not be, but I tell you what, in 25 years it's the first time I've seen anything like that.... As health[y] as he got as he got older, that's very unique." (Ferrone Depo. at 100.) Of this line of comments, along with the comments Ferrone made at the OJSGC hearing on February 18, 1999, Roadway states in its Reply memorandum that "Ferrone was simply noting for the Committee the inescapable biologi-

cal fact that the human body does not usually get stronger as it reaches middle and advanced age and was also explaining to the Committee why plaintiff's bare-bones release was woefully inadequate under these circumstances." (Doc. # 18 at 17–18.) What Roadway appears to be overlooking is that, as the Supreme Court has stated, age and a history of disability cannot be used as a proxy for one's ability to perform a job. Assumptions based on one's subjective belief in "inescapable biological facts" are exactly the sort of assumptions that the ADA and the ADEA prohibit.

that right is denied over the course of one week, one month, or 17 months. Accordingly, the Court believes that if the facts were to demonstrate that Roadway acted unlawfully in causing Pollitt's delayed reinstatement, then the inherent evil of the disparate treatment, along with his loss of income and benefits over that time, be it for the full 17 months, or even the shorter time periods between his physical with Dr. Pedoto and his reinstatement or his physical at the Cleveland Clinic and his reinstatement, would constitute an adverse employment action.

■ Finally, there is no doubt that Pollitt was qualified for the P & D driver's job, in satisfaction of prong (3). Even if upon greater scrutiny of the facts Roadway's initial concerns about Pollitt's perceived disability appear well taken, at the prima facie stage of the analysis, the focus is merely on whether he met the objective qualifications for the job. Because Pollitt disputes the fact that Roadway had a legitimate basis for questioning his fitness for the job, the Court will not inquire, at the prima facie stage of the *McDonnell Douglas* analysis, into the factual truth of Roadway's facially non-discriminatory justifications for not immediately reinstating him. To do so would require the Court to consider at this initial juncture Pollitt's rebuttal argument, thus defeating the role of the tripartite analysis engendered by *McDonnell Douglas.* The prima facie inquiry is not so searching, and the Sixth Circuit has frequently repeated that a prima facie showing of a plaintiff's qualifications for a job need only be enough to demonstrate that the plaintiff meets the legitimate, objective criteria established by the employer. *See Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719, 731–32 (6th Cir.2000) (" '[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of

the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.' ") (quoting *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 660–61 (6th Cir.2000)); *Cline, supra* (quoted in *Hoskins, supra;* stating that any consideration of the employer's stated non-discriminatory reason for taking the adverse action against the plaintiff is "required" by *McDonnell Douglas* to be considered at the rebuttal stage); *Gafford v. General Elec. Co.,* 997 F.2d 150, 167 n. 9 (6th Cir.1993) (rejecting the proposal to require a plaintiff to show, at the prima facie stage, that he was "as qualified" as other candidates or employees); *Brown v. Tennessee,* 693 F.2d 600, 603 n. 5 (6th Cir. 1982) (plaintiff's proof must only support "the conclusion that the plaintiff was qualified according to the legitimate criteria disseminated by the company or as found by the district court"). The fact that Pollitt had previously held the job, and ultimately proved fit for reinstatement in 2000, creates a genuine issue as to whether he was qualified for the job at any time between February 1, 1999, and June 28, 2000.

■ Because the Court finds that the facts in the record give rise to a genuine issue as to each prong of Pollitt's prima facie case of disability discrimination, it must consider Roadway's facially non-discriminatory justifications for delaying Pollitt's reinstatement. Roadway easily satisfies its burden of production. First, it contends that it was justified in not reinstating Pollitt upon his return on February 1, 1999, because, as far as its records indicated, Pollitt was no longer an employee with any seniority. Furthermore, it argues it had a bona fide reason to be concerned about Pollitt's physical fitness after his disability leave of more than 17 years, and that the medical release signed by Dr. Ronald Grove did not adequately

address his past, disabling conditions.[15] It also takes the position that its concern was validated by the OJSGC's decision of February 18, 1999. It argues that after the OJSGC issued said decision, it had no obligation to reinstate Pollitt until he first came forward with a medical release allowing its physicians to consult with and obtain medical records from his own physicians, with specific reference to his present fitness vis-a-vis the 17 ailments of which he complained to Dr. Schneider in 1991. As for whether it reinstated Pollitt in a timely fashion after it finally received what it considered to be a sufficient medical release, in March of 2000, it contends that it did.

Shifting, then, to the third stage of the *McDonnell Douglas* analysis, the Court finds that the facts adduced by Pollitt sufficiently rebut the facially non-discriminatory justifications proffered by Roadway, and create a genuine issue as to whether Roadway acted on the basis of disability-related animus. There is no doubt that the OJSGC agreed with Roadway on February 18, 1999, that Pollitt needed to provide more information than that included in Dr. Ronald Grove's medical release, and that it also agreed with Roadway on April 15 and again on May 21 that Pollitt had not complied with the letter of its February 18 decision. Yet, those facts do not demonstrate that Roadway did not act with discriminatory animus toward Pollitt throughout the roughly 17–month period of time between February 1, 1999, and June 28, 2000. The facts adduced by Pollitt call into question the factual truthfulness of Roadway's assertion that the medical releases provided by Dr. Ronald Grove and Dr. Long, taken individually or together, were not adequate for purposes of his reinstatement after his lengthy absence. Furthermore, and irrespective of the issue just noted, the facts adduced by Pollitt creates genuine issues as to whether Roadway's justifications were the true reasons for why it did not reinstate him, even if it is acknowledged that his medical release was truly insufficient, and whether Pollitt was treated on equal footing with others who were similarly situated. In other words, Pollitt has adduced facts which raise the specter that Roadway's facially non-discriminatory justifications are pretextual, under all three methods of rebuttal set forth by the *Manzer* court, to wit: he has a created genuine issues as to whether Roadway's justifications are "factually false," purely pretextual, and/or "insufficient to motivate [delaying his reinstatement]." 29 F.3d at 1084.

Because there seems to be no dispute that Roadway, rightly or wrongly, removed Pollitt from its seniority list in the early 1990s, had it proffered only that fact as its justification for not reinstating Pollitt, and had the OJSGC agreed with it that such an action conformed with the terms of Article 43 of the CBA, then this would be a simple case, and Pollitt's claim would fail. However, by proffering the additional justification, that it did not believe Pollitt was entitled to return to work until he provided a medical release to its liking, Roadway raised the question on its own whether it was motivated by some other factor. Indeed, conceding as it does that the OJSGC found that it had acted improperly in removing Pollitt from its seniority list, Roadway simply cannot rely on the seniority issue as the basis for not reinstating him, at least not from any point following the February 18, 1999, decision.

---

**15.** Ferrone stated at his deposition: "We are a very safety oriented company and looking at this guy's record and what he turned in, there would be no way that we would have simply sent him to our doctor until such time as he was released fully from his doctor." (Ferrone Depo. at 78.)

As for the sufficiency of the medical releases Pollitt provided from his various physicians, the question under the first method of rebuttal set forth by the *Manzer* court is whether the factual basis for the justification is false. Roadway had no express, written policy regarding the thoroughness of a medical release provided by an employee returning from disability leave (Ferrone Depo. at 79–80), and Article 47 of the CBA, which governed the question, merely states that the employer retains the right to select a physician to administer a physical in any circumstance in which it is appropriate for it to require such. (*Id.* at Ex. 20, at 179.) *If* the employer does direct the employee to a physician of its choice to obtain a physical, and *if* the Teamsters union, on behalf of the employee, disagrees with the result of the employer's physician's evaluation, the employee is entitled to a second opinion at the union's expense. If the two opinions are at odds, the physicians are then to select jointly a third physician, who's opinion is final and binding. (*Id.*) Roadway did not direct Pollitt to a physician of its choosing until over a year after he provided it with the release from Dr. Ronald Grove stating that he was fit to work, even though nothing in the CBA and nothing in the company's written policies required an

employee to provide a medical release as the first order of business, let alone a detailed medical release to Roadway's particular liking. The very terms of Article 47, which contemplate the employer taking the first step, belies Roadway's insistence that it had a right to demand a detailed medical release from Pollitt before it allowed him to see one of its own physicians. Furthermore, although it argues that its justification was supported by the February 18, 1999, decision by the OJSGC, as well as that tribunal's subsequent interpretations of its initial decision, that does not explain how or why Roadway came up with the justification in the first instance, or exonerate it from liability under federal law, particularly given the fact that the OJSGC expressly stated that it would not consider the ADA in rendering its decision, and, moreover, that it had no such authority in any event to determine Roadway's compliance therewith. In light of this, a genuine issue exists as to whether Pollitt's medical release was, in fact, inadequate under any actual policy of Roadway or the CBA, such that it could rely on this fact as a legitimate basis for refusing to reinstate him.[16]

The genuine issue just noted is important because it gives rise to a reason-

---

**16.** For support of its argument that it had a right to insist on "adequate medical information from plaintiff's doctors before having him examined by a company-hired doctor and before reinstating plaintiff," Roadway cites *Porter v. United States Alumoweld Co., Inc.,* 125 F.3d 243 (4th Cir.1997). (Doc. # 18 at 13.) The Court does not find *Porter* persuasive in this instance. In that case, the employer insisted, upon receiving a "bare-bones" medical release from the employee plaintiff's physician, that the employee undergo a "functional capacity evaluation" before reinstatement. 125 F.3d at 245. When the employee refused to undergo the evaluation, he was fired. *Id.* The Fourth Circuit agreed with the employer that it had the right to require such an evaluation under the ADA. *Id.* at 246–47. The Sixth Circuit has reached the same conclusion under similar facts. *See, e.g., Sullivan v. River Valley School Dist.,* 197 F.3d 804, 812 (6th

Cir.1999), *cert. denied* 530 U.S. 1262, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000); *Moore v. Board of Educ. of Johnson City Schs.,* 134 F.3d 781, 783 (6th Cir.), *cert. denied* 525 U.S. 929, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998). Neither this Court, nor Pollitt, disputes that Roadway had a right to have Pollitt thoroughly evaluated. *See* 42 U.S.C. § 12112(d)(4)(B); 29 C.F.R. § 1630.14(c). Indeed, *the question is why it did not do so,* and whether, in not doing so, it treated him differently than other employees returning from disability leave under similar circumstances. Roadway's citation to *Porter* (and to *Sullivan*) does not explain why it simply did not have Pollitt fully evaluated by one of its own chosen physicians, as it typically did with similarly situated employees (*see* Blackert Depo. at 20–21), and as its own Dr. Howard later recommended.

able inference that Roadway's assertion that it was acting out of concern for the sufficiency of Pollitt's medical release was false. True, the facts in the preceding paragraph do not point directly toward a discriminatory motive, at least not one based on disability, but when ruling on summary judgment, that consideration is immaterial. It is enough for the time being that the truthfulness of Roadway's facially non-discriminatory justification for acting as it did has been called into question. While the Supreme Court has made it clear that the falsity of the employer's purported justification is not enough to support a finding of liability, when taken by itself, and that it must also be shown that the employer's true reason for acting as it did was discriminatory animus, *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742, it has made it equally clear that where falsity has been demonstrated, the trier of fact is permitted to conclude, though it need not, that "discrimination may well be the most likely alternative explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Manzer*, 29 F.3d at 1084 (stating that one manner in which a plaintiff can rebut the employer's facially non-discriminatory justification is by creating a genuine issue as to whether such is false). In other words, to survive summary judgment, Pollitt need not raise a genuine issue as to whether Roadway acted with discriminatory intent; he need only raise a genuine issue, as he has done, that its purported reason for acting was factually false. It is for the trier of fact to weigh the competing inferences and determine whether discrimination was what motivated Roadway to delay reinstating Pollitt.

In addition, pursuant to the *Manzer* court's second suggested method of rebuttal, Pollitt has created a genuine issue of whether Roadway's explanation that his medical releases were insufficient was mere pretext. Ferrone's alleged statement that Roadway did not want to reinstate Pollitt because he would "fall apart" because of his "old age" is relevant in this context, not to demonstrate that Roadway acted out of *disability-based* animus, but to demonstrate that it did not act because of the insufficiency of Pollitt's release from Dr. Ronald Grove. As an additional factor, in January, 1999, after Pollitt had notified Roadway that he intended to return to work on February 1 of that year, Blackert purportedly told a recently laid off Roadway driver, Joseph Bolton, that "Paul [Pollitt] will never set foot back on this property again." (Bolton Aff. ¶ 3.) If, as the Court assumes for purposes of ruling on Roadway's Motion for Summary Judgment, Blackert truly made this statement, it is probative evidence that Roadway was preparing to fight Pollitt's reinstatement for reasons unrelated to his fitness or seniority status, for certainly, without first hearing Pollitt's explanations, there would be no reason for Blackert to state so affirmatively from the outset that he would "never" be allowed to return to work.

Finally, even if Roadway could demonstrate conclusively that, in the abstract, it had the right to demand a detailed medical release from Pollitt before reinstating him, the facts give rise to a genuine issue as to whether his failure to provide such gave it the right to refuse reinstating him. The *Manzer* court noted, as its third suggested method of rebuttal, that evidence that more favorable treatment was given to similarly situated employees outside of the protected class is probative to the question of whether the employer's facially non-discriminatory justification was truly a sufficient basis for taking the less favorable action against the plaintiff. Roadway argues that "Plaintiff cannot point to any other Roadway employee whose medical release was determined to be inadequate by a joint grievance committee." (Doc.

# 10 at 13.) The Court finds this argument misplaced, as it puts the cart before the horse. The focus should be on Roadway's treatment of Pollitt, and whether it treated him differently as an initial matter.

In its favor, there is evidence that other employees returning from disability leave of one year or greater submitted medical releases prior to it taking any action in response. (Blackert Depo. at Ex. 1; Jenkins Aff. at Ex. B.) However, none of these medical releases, obtained by Pollitt in discovery, provides more than the generic statement that the employee in question is fit to return to work. For example, Jack Davenport was on leave for over seven years, Kenneth Jenkins for over four and a half years, Gary Waugh for almost four and half years, Allen Schmitz for over four years, Jack Colvin for almost four years, Clarence Price for over three and half years, Russell Holcomb for over three years, Lester Jackson for almost three years, Terry Grant for about two and a half years, and Lloyd Hunt for almost two and half years. With respect to all of these individuals, the medical releases provided stated only something to the effect that the respective employee was "able to return to work." No more information appears with respect to any of these individuals, and Roadway made no attempt in its Reply memorandum (Doc. # 18) to explain this information in any other context. It may be that Roadway had a "common sense" duty to scrutinize Pollitt closely after his 17–year absence, but this would be no less true of any of the individuals noted above. What Roadway may not do is treat similarly situated employees differently, and the Court rejects, as arbitrary, the distinction Roadway attempts to draw between disability leave of 17 years and that of only seven years, or four years, or even three or two years.

As an additional example of an apparent difference in treatment, Pollitt has ad-duced evidence of another employee, Ronald Burnett, who was on disability leave from his driver's position for almost nine years. (Jenkins Aff. at Ex. C.) On February 9, 1994, his physician provided a medical report, releasing him to return to work, and he was reinstated a month later on March 11. Interestingly, Burnett's physician's report makes a general reference to his past injuries and medical and employment records, and states that "[t]hese records are reviewed for their content, and are considered in this report." This reference is not unlike Dr. Long's general reference, in his medical release of April 23, 1999, to Pollitt's 17 ailments of which he complained to Dr. Schneider in 1991, of which Dr. Long stated: "I have extensively reviewed these items with the patient. He no longer maintains subjective complaints of any of the 17 listed items. A recent thorough examination (03/10/99) of Mr. Pollitt revealed no objective orthopedic, neurologic or chiropractic findings to substantiate any of the 17 items listed." (Blackert Depo. at Ex. 11.) While it appears that this single medical report and release was sufficient for purposes of reinstating Burnett in a month's time after an almost nine-year absence for extensive injuries, with respect to Pollitt, Roadway apparently wanted much more. It wanted access to Dr. Long, Dr. Ronald Grove, Dr. Jeffrey Grove, and Dr. Schneider, all pertinent medical records, and a detailed analysis of the current state of each of the 17 ailments of which he had complained about eight years earlier to Dr. Schneider. Furthermore, even after he received a thorough evaluation from Dr. Pedoto in March, 2000, it appears Roadway still requested that he visit the Cleveland Clinic for further tests, and even then did not arrange for the appointment for another three months. If all of these facts are true, it is probative evidence that Roadway's *perception of Pollitt's disability and history of*

*being disabled* prevented it from simply accepting the fact that Pollitt, after having been away from the job for more than 17 years, was fit to return to work. That is exactly the attitude that the ADA prohibits.

The Court finds Roadway's insistence that Pollitt failed to comply with the letter of the OJSGC decision of February 18, 1999, and that tribunal's subsequent interpretations of that decision, rendered on April 15, and May 21, respectively, of little merit. The OJSGC's decision was anything but a work of clarity. It did not define with even the remotest specificity what information Pollitt was expected to provide to Roadway. The pertinent part of the original *decision,* which is to be distinguished from Ferrone's statements made during the hearing, is but a single sentence. It made no mention of the 17 ailments of which he had complained in 1991, and stated only that Pollitt was to provide "a detailed medical release indicating what injuries and or illnesses he is released from and what restrictions if any." (Pollitt Depo. at Ex. 1, at 53.) What is more, the facts are uncontroverted that Pollitt did not even have a copy of Dr. Schneider's 1991 report in his possession at the time this decision was rendered, and that the OJSGC did not, and could not, determine Roadway's compliance with the ADA in rendering its decision.

Similarly, the April 15 decision, which clarified that Pollitt was to allow Roadway to inquire into the 17 ailments mentioned in the 1991 report, made no mention of any production of physical records, and stated only that a physician selected by Roadway may "converse" with his physicians about said ailments. (*Id.* at Ex. 2, at 23.) Given this language, it was not unreasonable for Pollitt to object to Roadway's request for physical records, at least until the matter was further clarified by the OJSGC.

Likewise, there was never any mention before the May 21 hearing that Pollitt was required to allow Roadway physicians to speak to all of the physicians who were subsequently specified in the release of information form signed at that hearing. Furthermore, the fact that Pollitt's union representative, Doug Davis, and the OJSGC repeatedly agreed with Roadway with respect to its interpretations of what Pollitt was obliged to provide does not render his consistently more narrow interpretations unreasonable; it means only that Roadway was more persuasive before the OJSGC. In any event, to the extent it is relevant, Article 45 of the CBA states that where the OJSGC "settles" a dispute by a majority vote, the decision is "final and binding" on both parties. (Ferrone Depo. at Ex. 20, at 234.) In this case, the OJSGC never "settled" any dispute. In each of its decisions of February 18, April 15, and May 21, 1999, it acknowledged that the matter was not concluded, and the ambiguity of each OJSGC decision and the subsequent actions of the parties merely reaffirm that nothing was ever settled. Thus, while Roadway is free to argue at trial that it acted reasonably in light of the OJSGC decisions and that Pollitt did not, the fact that it persuaded the OJSGC in an unsettled dispute to view the situation in its favor is immaterial to the Court's ruling on summary judgment in this instance.[17]

17. *See MidMichigan Reg'l Med. Ctr.—Clare v. Professional Employees Div. of Local 79,* 183 F.3d 497, (6th Cir.1999) (stating that a court "must defer to the arbitrator's findings of fact and interpretations of the CBA" where the CBA makes the arbitrator's decision "final and binding"). Because none of the OJSGC's decisions at issue in this case was final, be-

cause it made no express findings of fact, because the OJSGC expressly declined to make findings or any decision on the basis of a discrimination claim, and because the OJSGC did not have the authority to determine whether Roadside was in compliance with the ADA, the Court finds no reason to

Finally, on a related note, the Court is not persuaded that there is much relevance at this stage of the litigation to Roadway's purported reliance on the letter from Dr. Howard, dated July 1, 1999, stating that it was his opinion, after allegedly speaking with Dr. Jeffrey Grove and Dr. Long, that Pollitt stood a "very strong probability" of injuring himself again on the job. (*See* Doc. # 18 at 15–16; Blackert Depo. at Ex. 15.) To begin with, Dr. Howard did not opine that Pollitt should not be reinstated, only that he stood a likelihood of injuring himself, and that before he was reinstated, he should be thoroughly examined and tested. (Blackert Depo. at Ex. 15.) Thus, Dr. Howard's letter, at most, calls into question the reliability of the medical releases provided up to that point by Pollitt; it does not explain why Roadway did not proceed with scheduling such an examination. Moreover, even had Roadway relied upon the letter to cast doubt upon the medical releases provided up to that point, a reliance such as this is of limited relevance for several other reasons: *First,* the letter sheds no light on Roadway's motivation prior to its receipt. *Second,* Ferrone did not see this letter until the July 15 hearing, and Blackert only saw it shortly before that date. (Ferrone Depo. at 86; Blackert Depo. at 114–15.) Furthermore, Dr. Long disputed Dr. Howard's factual representations in a letter dated July 19 (Blackert Depo. at Ex. 16), which was received by Roadway. Thus, at most, Roadway can claim a good faith reliance on Dr. Howard's letter for a period of only several days to several weeks. *Third,* Dr. Howard's letter is completely irrelevant to the extent Pollitt is claiming continued discrimination, in the

form of delay, after he received his positive physical evaluation from Dr. Pedoto in March of 2000.

The cases cited by Roadway for support are inapposite. In *Pesterfield v. Tennessee Valley Authority,* the Sixth Circuit stated that where an employer has a good faith basis for believing the opinion of a physician, and its good faith understanding of that medical opinion is that the employee in question is not suited for returning to work, it matters not whether subsequent revelations indicate that the employer misunderstood the physician's report. 941 F.2d 437, 443 (6th Cir.1991). Importantly, in *Pesterfield,* the district court had found, and the Sixth Circuit accepted as true, that there was no evidence contradicting the employer's assertion that it relied upon the employee's physician's report in good faith, and that it interpreted it in good faith. *Id.* Roadway cannot say the same. Dr. Long quickly responded to Dr. Howard's assertions and disclaimed them completely. Furthermore, Dr. Howard did not speak to Dr. Ronald Grove, who, as Roadway was aware, had performed an earlier evaluation of Pollitt. Rather, he spoke with Dr. Jeffrey Grove, who, as Roadway was also aware, had not treated Pollitt, and whose opinion, one could argue reasonably, should not have been credited with the same weight as his father's. In any event, Dr. Howard's opinion, at most, called into question the opinions of Dr. Ronald Grove and Dr. Long; it did not negate them, especially after Dr. Long rehabilitated his opinion, so as to defeat Pollitt's assertion that he was ready to return to work.

A second case out of the Sixth Circuit, *Harris v. Electronic Data Systems Corp.,*

defer to what would amount to, at best, implied assumptions of fact, made in an entirely different legal context.

1996 WL 99311, at *6 (6th Cir. March 6, 1996), is even less helpful to Roadway. That case stands for the proposition that where an employer demonstrates that it relied in good faith on an investigator's report that one of its employees had committed a violation of company policy, and fired her for that reason, that the employee plaintiff cannot rebut the employer's explanation for her discharge merely by showing that she did not, in fact, commit the violation. Instead, she must go further and adduce facts calling into question whether the employer actually relied upon the report in good faith. As this Court has already explained, Pollitt has adduced facts calling into question whether Roadway could have relied upon Dr. Howard's letter in good faith, at least for any more than a few days to a few weeks. Thus, Pollitt has overcome the evidentiary hurdle that the plaintiff in *Harris* apparently did not. The cases Roadway cites from the Fifth and Seventh Circuits hold nothing more than *Pesterfield* and *Harris,* and are likewise inapposite. (*See* Doc. # 18 at 16.)

In sum, the Court finds that Roadway's own comments on page 13 of its Motion can be construed as direct evidence that it discriminated against Pollitt, on the basis of his perceived disability and history of being disabled, such that a genuine issue of material fact exists on this issue. In addition, even if such a statement is not direct evidence of discrimination, the Court finds, pursuant to the analysis first set forth in *McDonnell Douglas,* that Pollitt has placed sufficient facts into the record which give rise, in indirect fashion, to a genuine issue of material fact as to whether Roadway discriminated against him on the basis of his perceived disability and history of disability. Accordingly, to the extent it relates to Pollitt's claim of disability discrimination under the ADA (Count Two), Roadway's Motion for Summary Judgment is OVERRULED.

### C. Discrimination Under Ohio Rev. Code § 4123.02 (Count Three)

██ Ohio Rev.Code § 4112.02(A), prohibits discrimination in the work place based on, among other characteristics, age and disability. It is generally construed in identical fashion as its counterpart federal laws. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128 (1981); *Peters v. The Lincoln Elec. Co.,* 285 F.3d 456, 469 (6th Cir.2002). Accordingly, for the identical reasons stated above, as to Count Three of Pollitt's Complaint, for violations of Ohio Rev.Code § 4112.02(A), Roadway's Motion for Summary Judgment is OVERRULED.

### D. Retaliation in Violation of the ADEA, ADA & Ohio Rev.Code § 4112.02 (Count Four)

██ Under the ADA, the ADEA, and the § 4112.02 of the Ohio Revised Code, employers may not take an adverse employment action against an employee in retaliation for the employee having invoked his rights under those provisions. *See* 42 U.S.C. § 12203(a), 29 U.S.C. § 623(d) & Ohio Rev.Code § 4112.02(I). The basis for Pollitt's retaliation claim (Count Four) is that he has been harassed and treated less favorably since his return to work on account of his having attempted to avail himself of his rights under the various discrimination statutes, and that, as such, he has had to endure a hostile work environment. (Doc. # 15 at 36–37.) "Discrimination in this form occurs 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working envi-

ronment.'" *Williams v. General Motors Corp.,* 187 F.3d 553, 560 (6th Cir.1999) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.").

■ Pollitt has not adduced any facts which might give rise to a finding or an inference that the alleged harassment he endured was so "severe or pervasive to alter the conditions" of his employment. Accordingly, there being no genuine issue of material fact on this issue, as to his claim for retaliation (Count Four), Roadway's Motion for Summary Judgment is SUSTAINED.

## VI. *Conclusion*

For the reasoning and citations of authority cited above, the Court hereby SUSTAINS Roadway's Motion for Summary Judgment (Doc. # 10) as it relates to Pollitt's claim for retaliation (Count Four), and OVERRULES said Motion as it relates to Pollitt's claims for discrimination under the ADEA (Count One), the ADA (Count Two) and Ohio Rev.Code § 4112.02 (Count Three).